[Crim. No. 25685. Second Dist., Div. Two. May 6, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL JESSE SALDANA, Defendant and Appellant.

COUNSEL

Roland H. Fairfield for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**BEACH, J.**—After a court trial, jury having been waived, Michael Saldana and his codefendant Ruben Arebalo[1] were convicted of second degree murder of one Joseph Fenoff. Saldana, who had just turned 18 at the time of trial, was sent to the California Youth Authority. He appeals from the judgment of conviction.

FACTS:

Debra Fenoff, the victim's sister, thought that defendant Arebalo was following her in his car as she walked home from a friend's house on the evening of December 10, 1973. After going home she went out for a short while; when she returned, Arebalo was parked across the street from her home. On her brother Cliff's advice, she asked Arebalo why he was following her; he denied following her.[2] After Cliff asked him to leave, Arebalo drove away.

Cliff and a friend drove to a liquor store. While Cliff was away, Arebalo, appellant and some others arrived in Arebalo's car. Arebalo asked where the "big mouth" was, apparently referring to Cliff. Several witnesses testified about the following incidents. The exact sequence of events is unclear, but as Cliff and his friends were returning, Mike Saldana shot Joe Fenoff in the neck from close range. Michelle Ehlers testified that Joe said to Mike "Why don't you talk reasonable to my brother?" to which Mike replied "Shut up or I will shoot you." Debra Fenoff saw Mike with his arm extended, heard a pop, and saw Joe grabbing his neck. Sandra Lee Gannon testified Joe told Mike he was

---

[1]Arebalo is not a party to this appeal.

[2]He explained at trial that he had friends on the block and had come to see Michelle Ehlers, with whom he had spent time earlier in the evening.

going to get himself in trouble, that he should talk things over; Joe tried to knock the gun out of Mike's hand, but he missed and Mike shot him. According to Sandy's version, the gun was originally pointed at Cliff. Although he later changed his story, Mike did at one time admit to the police that he shot Joe.

Both appellant and Arebalo admitted being at the scene of the crime. They said they had gone to straighten out the false report that Arebalo had been following Debra Fenoff. Mike Saldana had gone along since he knew the Fenoff family. They testified that Manuel Ayala, who denied any complicity in the crime, fired the shot.

The victim, Joe Fenoff, was shot on December 10, 1973. He died on December 19, 1973. According to medical testimony the cause was a single gunshot wound to the neck.

Dr. William Bezdek testified that Joe's brain had died; there was no electrical activity in the brain starting on December 17, and no clinical activity since the time of admission. Without drugs and the respirator, Joe's other organs such as heart and lungs would have ceased to function in short order. With particular care, the hospital could have sustained Joe's heartbeat for "probably several weeks to a month." Dr. Bezdek defined death as "a failure of part of that organism such that the total organism is no longer functioning in a manner which a reasonable, intelligent person would recognize as the purpose of that organism."

He testified that Joe was dead when he arrived at the hospital and that there has been no known case of recovery after documented absence of electrical activity in the brain.[3] Medical literature sees brain death as synonymous with death. Dr. Bezdek stated that the severance of a carotid artery in Joe's brain caused his death.

Attorneys for Arebalo and Saldana both moved to dismiss the case on the ground that an intervening act caused the victim's death.

CONTENTIONS ON APPEAL:

1. There was insufficient evidence regarding the identity of the gunman.

---

[3]In his reply brief, appellant attaches a recent newspaper article of a medical case that purports to contradict this. Assuming the factual accuracy of the newspaper article, the occurrence of such a case (of a "return to life") does not change the evidentiary value of the criterion used by the doctor at trial.

2. There was an independent, intervening cause of death; appellant should not be held criminally responsible for the death of Joseph Fenoff.

DISCUSSION:

1. *There was sufficient evidence to support the judgment.*

Appellant was observed at the scene of the crime by several witnesses. Some had earlier indicated that one Manuel Ayala was the triggerman, but they explained the circumstances of that identification to the court's satisfaction. Appellant's later explanation of his confession of the shooting was apparently not accepted by the court; he testified that he confessed so that the police would not file against his brother and another person, neither of whom was even at the scene of the crime.

 An appellate court does not reweigh the evidence. Rather, our task is to determine if substantial evidence supports the judgment. (*People* v. *Reilly*, 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649].) The credible testimony of several eyewitnesses, along with a confession by appellant, is certainly substantial evidence.

2. *The victim's death was caused by appellant's act.*

Appellant makes two contentions regarding the death of Joseph Fenoff: (1) There was no showing that Joseph would not have survived for more than three years and a day had he been left on the machine;[4] and (2) the removal of Joseph from the respirator was an unforeseeable intervening cause of death, so appellant should not be held criminally responsible for the killing.

Regarding the definition of death and the actual fact of Joe Fenoff's death, we initially note that defendants produced no evidence to contradict the testimony of Dr. Bezdek. Counsel argued that removal from the respirator was an independent cause of death, but no evidence was presented to that effect. Given the current state of medical science as explained by the People's witness, we cannot say as a matter of law that the victim was not dead when he reached the hospital, much less when the artificial life-support systems were removed. The evidence presented

---

[4]Penal Code section 194 provides: "To make the killing either murder or manslaughter, it is requisite that the party die within three years and a day after the stroke received or the cause of death administered. In the computation of such time, the whole of the day on which the act was done shall be reckoned the first."

clearly points to the cessation of Joe Fenoff's brain functions, and thereby his death, prior to the removal of such systems and well within the statutory time limits.[5]

The judgment of conviction is affirmed.

Roth, P. J., and Compton, J., concurred.

---

[5]We note that since the time of the murder, the California Legislature has defined death for the purpose of organ transplantation. Section 7180 Health and Safety Code (Stats. 1974, ch. 1524) provides: "A person shall be pronounced dead if it is determined by a physician that the person has suffered a total and irreversible cessation of brain function."

The statute also provides: "Nothing in this chapter shall prohibit a physician from using other usual and customary procedures for determining death as the exclusive basis for pronouncing a person dead." The statute while not related to homicide, indicates legislative acceptance of the same criterion used by the medical profession and by the doctor in the present case.