824 A.2d 1082

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. SONNEY
PELHAM, A/K/A ZEKE, DEFENDANT–RESPONDENT.

Argued February 19, 2003—Decided June 19, 2003.

*Mark Paul Cronin,* Deputy Attorney General, argued the cause for appellant *(Peter C. Harvey,* Acting Attorney General of New Jersey, attorney; *Lisa Sarnoff Gochman,* Deputy Attorney General, of counsel and on the briefs).

*Susan Brody,* Assistant Deputy Public Defender, argued the cause for respondent *(Yvonne Smith Segars,* Public Defender, attorney).

The opinion of the Court was delivered by

LaVECCHIA, J.

This criminal appeal focuses on a disputed jury instruction involving the subject of causation. Defendant was convicted of second-degree death by auto, in contravention of *N.J.S.A.* 2C:11–5. At trial, the court instructed the jury that a car-accident victim's voluntary removal from a respirator was legally insufficient as an independent intervening cause and thus incapable of breaking the chain of causality between defendant's acts and the victim's death. Specifically, the charge informed the jury that if it found "that the defendant's actions set in motion the victim's need for life support[,] the causal link between the defendant's actions and the victim's death is not broken by the removal or refusal of life support as long as you find that the death was the natural result of the defendant's actions." The Appellate Division reversed and remanded for a new trial because, in its view, "the charge to the jury on intervening cause deprived defendant of his constitutional

right to have the jury in a criminal trial ... decide all elements of the charged offense." *State v. Pelham*, 353 *N.J.Super.* 114, 126, 801 *A.*2d 448 (2002). We reverse.

It is beyond dispute that individuals have the right to self-determination in respect of medical care generally and, specifically, in respect of rejecting or removing life support devices or techniques. We conclude that the jury may be instructed, as a matter of law, that a victim's determination to be removed from life support is a foreseeable event that does not remove or lessen criminal responsibility for death.

## I.

The facts of the horrific car accident in which defendant, Sonney Pelham, was involved are summarized from the trial record. On the evening of December 29, 1995, William Patrick, a sixty-six-year-old lawyer, was driving his Chrysler LeBaron in the right lane of northbound Route 1 in South Brunswick. At approximately 11:42 p.m., a 1993 Toyota Camry driven by defendant struck the LeBaron from behind. The LeBaron sailed over the curb and slid along the guardrail, crashing into a utility pole before it ultimately came to rest 152 feet from the site of impact. The Camry traveled over a curb and came to rest in a grassy area on the side of the highway.

Two nearby police officers heard the collision and rushed to the scene. The officers found Patrick, still wearing his seatbelt, unconscious and slumped forward in the driver's seat. The rear of the LeBaron was crumpled through to the rear tire and the backseat, and the convertible top was crushed. Patrick was making "gurgling" and "wheezing" sounds, and appeared to have difficulty breathing. His passenger, Jocelyn Bobin, was semi-conscious. Emergency crews extricated the two using the "jaws of life" and transported them to Robert Wood Johnson University Hospital (Robert Wood Johnson). Bobin was treated and later released.

At the accident scene, Officer Heistand smelled an odor of alcohol on defendant's breath, and noted that he was swaying from side to side and front to back. He had no injuries, but was "belligerent." Heistand believed defendant was intoxicated. Three field sobriety tests were conducted. Defendant failed all three. He was placed under arrest for driving while intoxicated, transported to the police station, and later taken to Robert Wood Johnson for a blood alcohol test. He eventually consented to be tested approximately two hours after the accident. Two separately administered tests indicated that defendant's blood alcohol content (BAC) at that time was .18 to .19. Experts assessed his BAC between .19 and .22 at the time of the accident.

Patrick's condition was critical on his arrival at Robert Wood Johnson. He had suffered a constellation of injuries, including a spinal column fracture that left him paralyzed from the chest down and a "flailed chest," a condition in which the ribs are broken in multiple places causing uneven chest wall movement during each breath. Other injuries included a contusion and puncture of his lung, a head injury, fractured sinuses, and a broken hip. The catastrophic injuries Patrick experienced made it virtually impossible for him to breathe on his own. Paralysis rendered him unable to use his abdominal muscles and he had aspirated contents of his stomach that were now lodged in his airway despite an implanted nasal gastric tube. He was placed on a ventilator. Within five days of the accident, Patrick experienced "Adult Respiratory Distress Syndrome," a diagnosis indicating that his lungs had begun to fail. His heart beat was rapid and irregular, and his blood pressure was dropping because of the turmoil within his body. Low blood pressure triggered the start of kidney failure.

Patrick's paralysis rendered him at an increased risk for pulmonary thromboemboli, or blood clots. Accordingly, doctors implanted a vena cava filter through the major vein in the groin area and into the major blood vessel to the heart. The filters were intended to trap clots that form in the lower extremities. A ventilator

tube inserted through Patrick's throat was converted to a surgical airway through his neck and into his windpipe. Because Patrick was unable to feed himself, he was fed initially by a tube inserted through his nose to the stomach, and later by a tube directly into the stomach. In addition, because paralysis left him unable to control his bladder or bowels, a Foley catheter was inserted.

During his hospitalization, Patrick continually had bladder and urinary tract infections as a result of the catheter, and sepsis occurred. He also experienced antibiotic-resistant infections common to hospital settings, as well as numerous bouts with pneumonia.

On March 13, 1996, Patrick was transferred to the Kessler Institute for Rehabilitation (Kessler), because it specialized in the care of patients with spinal cord injuries. When he arrived, Patrick was unable to breathe on his own, and was suffering from multi-organ system failure. Medication was required to stabilize his heart rhythm. He was extremely weak, with blood-protein levels that placed him at high risk of death. He was unable to clear secretions in his airways, and thus his oxygen levels would drop requiring medical personnel repeatedly to clear the secretions. Complications from the ventilator caused pneumonia to recur due to his inability to cough or to protect himself from bacteria. Bowel and urinary tract infections continued.

While at Kessler, Patrick also was monitored by psychiatric staff. He presented as depressed, confused, uncooperative, and not engaged psychologically. At times he was "hallucinating," even "psychotic." The staff determined that he was "significantly" brain injured. Nonetheless, Patrick was aware of his physical and cognitive disabilities. During lucid moments, he expressed his unhappiness with his situation, and, on occasion, tried to remove his ventilator.

Patrick improved somewhat during the month of April, but then his condition rapidly regressed. By early May, severe infections returned, as well as pneumonia. It was undisputed at trial that Patrick had expressed to his family a preference not to be kept

alive on life support. Because of his brain damage, his lack of improvement, and his severe infections Patrick's family decided to act in accordance with his wishes and remove the ventilator. He was transferred to Saint Barnabas Medical Center and within two hours of the ventilator's removal on May 30, 1996, he was pronounced dead. The Deputy Middlesex County Medical Examiner determined that the cause of death was sepsis and bronchopneumonia resulting from multiple injuries from the motor vehicle accident.

Defendant was charged with first-degree aggravated manslaughter in contravention of *N.J.S.A.* 2C:11–4a. Defense counsel filed a motion to dismiss the indictment, contending that the removal of the ventilator constituted an independent intervening cause that insulated defendant from criminal liability.[1] The trial court held that the removal of life support was not an intervening cause and denied the motion. *State v. Pelham,* 328 *N.J.Super.* 631, 638–39, 746 *A.*2d 557 (Law Div.1998). In its decision, the court stated its intention to instruct the jury to that effect at trial. *Ibid.*

At trial, defendant's arguments focused on the reliability of the blood evidence and challenged the integrity of the chain of custody. He contended that the destruction of blood evidence, along with the inconsistent results of both BAC tests, demonstrated the unreliability of the results. Although the State produced expert testimony that Patrick's death was causally connected to the injuries he suffered as a result of the accident, defendant did not counter with a medical expert to refute the causal connection between Patrick's death and his accident injuries.

Consistent with its earlier stated intention, the trial court included in its jury charge on causation an instruction concerning intervening cause and a victim's determination to remove life

---

[1] Defendant never has contended that removal of the ventilator was a procedurally or substantively improper exercise of Patrick's right to self-determine his continuation on life support.

support. On those points, the trial court instructed the jury as follows:

To establish causation the State must prove two elements beyond a reasonable doubt. First, that but for defendant's conduct William Patrick wouldn't have died. Second, William Patrick's death must have been within the risk of which the defendant was aware. If not it must involve the same kind of injury or harm as the probable result of the defendant's conduct and must also not be too remote, too accidental in its occurrence or too dependant [sic] upon another's volitional act to have a just bearing on the defendant's liability or on the gravity of the offense. In other words, the State must prove beyond a reasonable doubt that William Patrick's death was not so unexpected or unusual that it would be unjust to find the defendant guilty of aggravated manslaughter.

Now, it is alleged that the victim William Patrick died approximately five months after the collision which occurred on December 29, 1995. With regard to the issue of remoteness there is no requirement that the State prove that the victim died immediately or within a certain period of time after the collision. Nevertheless, you may consider the time that elapsed between the collision and Mr. Patrick's death along with all of the other evidence in the case in determining whether the State has proven beyond a reasonable doubt that the defendant caused William Patrick's death as I've defined that term.

The State alleges that William Patrick died as a result of medical complications from the injuries which he sustained in the collision. Subject to the definition of causation which I have already given you the State may satisfy its burden of proving causation by proving beyond a reasonable doubt that William Patrick died from medical complications that resulted from injuries which he sustained in the collision provided that these injuries and medical complications were the precipitating and contributing causes of his death.

With regard to the issue of accident, if you find that Mr. Patrick's death resulted from preexisting medical conditions independent of the injuries and accompanying medical complications which he received as a result of the collision as the defendant contends then you must find him not guilty. If you find that Mr. Patrick died as a result of prior medical conditions being exacerbated or made worse by the collision you are instructed that criminal liability is not lessened because the victim is not in excellent health.

In other words, if you find beyond a reasonable doubt that the defendant's conduct accelerated or worsened any preexisting medical condition or illness which Mr. Patrick had thereby resulting in his death and meets the other conditions of causation then you should find the defendant caused Mr. Patrick's death.

Let me now instruct you on what an intervening cause is and what it's not. An intervening cause is a cause which breaks the original chain of causation. In that regard you have heard testimony that on May 30, 1996 William Patrick was taken off the ventilator pursuant to his wishes and that he died several hours later. I instruct you that the removal of life supports, in this case a ventilator, is not a sufficient intervening cause to relieve the defendant of criminal liability. In other

words, the removal of life supports from Mr. Patrick who is not brain dead was not a sufficient intervening cause to relieve Mr. Pelham from criminal liability.[2] If you find that the defendant's actions set in motion the victim's need for life support the causal link between the defendant's actions and the victim's death is not broken by the removal or refusal of life support as long as you find that the death was the natural result of the defendant's actions.

The jury acquitted defendant of aggravated manslaughter, but convicted him of the lesser-included offense of second-degree vehicular homicide. He was sentenced to a custodial term of seven years with a mandatory parole ineligibility period of three years. In the appeal from his conviction, defendant argued, among other points, that the trial court erred in instructing the jury that removal of life support was not an intervening cause if death was the "natural result" of defendant's actions. The Appellate Division agreed and reversed the conviction. *Pelham, supra,* 353 *N.J.Super.* at 126–27, 801 *A.2d* 448.[3]

We granted the State's petition for certification, 174 *N.J.* 545, 810 *A.2d* 65 (2002).

## II.

New Jersey has been in the forefront of recognizing an individual's right to refuse medical treatment. It is now well

---

[2] We do not approve of language in the last two sentences of this paragraph. Nonetheless, reviewing the charge as a whole, we believe that the jury did not misunderstand its obligation to determine the factual question concerning causation in this case, namely, whether Patrick's death resulted from the natural progression of his accident injuries and their complications. *State v. Wilbely,* 63 *N.J.* 420, 422, 307 *A.2d* 608 (1973) (stating "[c]harge should be examined as a whole to determine its overall effect"). To emphasize that the jury must make the causation determination, the court should have added language such as: "Should you make the finding that Mr. Patrick died from medical complications that resulted from injuries he sustained in the collision...." In such cases when instructing the jury on intervening cause, the trial court must make it sufficiently clear that the court is not directing a verdict on causation.

[3] The Appellate Division did affirm, however, the trial court's denial of defendant's motion to dismiss the indictment on the basis that the removal of life support constituted an intervening cause. *State v. Pelham,* 353 *N.J.Super.* 114, 123–24, 801 *A.2d* 448 (2002).

settled that competent persons have the right to refuse life-sustaining treatment. *In re Farrell,* 108 *N.J.* 335, 529 *A.*2d 404 (1987). Even incompetent persons have the right to refuse life-sustaining treatment through a surrogate decision maker. *In re Conroy,* 98 *N.J.* 321, 486 *A.*2d 1209 (1985).

The parameters of the right to refuse medical treatment were first addressed in the seminal case *In re Quinlan,* 70 *N.J.* 10, 355 *A.*2d 647, *cert. denied sub nom. Garger v. New Jersey,* 429 *U.S.* 922, 97 *S.Ct.* 319, 50 *L. Ed.*2d 289 (1976). We concluded that the right to decide whether to forego life-sustaining treatment was "a valuable incident [to the] right of privacy" afforded by both the New Jersey and United States Constitutions. *Id.* at 41, 355 *A.*2d 647. Any interest the State might have in preservation of life "weakens and the individual's right to privacy grows as the degree of bodily invasion increases and the prognosis dims." *Ibid.* As we explained, because Karen Ann Quinlan's prognosis was "extremely poor," any State-asserted interest in preserving life was outweighed by her right to self-determination. *Ibid.* The "bodily invasion" involved in her care was extensive, including constant nursing care, antibiotics, a catheter, a respirator, and a feeding tube. *Ibid.* We held that the only practical way to protect Ms. Quinlan's right to refuse treatment when she was incompetent was to permit her guardian to determine whether Ms. Quinlan would have refused life-sustaining treatment. *Id.* at 41–42, 355 *A.*2d 647. Cognizant of the liability risk attendant when physicians carry out such wishes, we also made clear that a doctor's termination of treatment, and consequent acceleration of death, is not homicide. *Id.* at 51–52, 355 *A.*2d 647 (stating that act of removing life support simply allows "expiration from existing natural causes"). Since the 1976 decision in *Quinlan,* numerous other courts, including the United States Supreme Court, have recognized the so-called "right to die." See *Cruzan v. Director, Missouri Dept. of Health,* 497 *U.S.* 261, 110 *S.Ct.* 2841, 111 *L.Ed.*2d 224 (1990) (recognizing that competent person has Fourteenth Amendment liberty interest in refusing unwanted medical treatment).

*Quinlan* was only the first of several opinions in which we were called on to address issues involving the right to refuse treatment. Nearly ten years later, in *Conroy, supra,* 98 *N.J.* at 365, 486 *A.*2d 1209, we considered whether a decision maker could refuse life-sustaining treatment on behalf of an elderly, infirm, and incompetent patient who was expected to die within a year but who still had some limited conscious interaction with her environment.

In *Conroy,* we focused on the extent to which the individual previously had indicated his or her desire to be subjected to life-sustaining treatment. *Id.* at 362–63, 486 *A.*2d 1209. In setting forth guidelines for those circumstances, we started from the baseline that "[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body." *Id.* at 346, 486 *A.*2d 1209 (quoting *Schloendorff v. Soc'y of N.Y. Hosp.,* 211 *N.Y.* 125, 129–30, 105 *N.E.* 92 (1914)). We observed that the right of self-determination is tempered by the State's countervailing interests, including: (1) preservation of life; (2) prevention of suicide; (3) protection of innocent third parties; and (4) safeguarding the integrity of the medical profession. *Id.* at 348–49, 486 *A.*2d 1209. However, those state interests usually will not preclude a competent person from refusing treatment for himself or herself. *Id.* at 349, 486 *A.*2d 1209. As we explained,

[r]efusing medical intervention merely allows the disease to take its natural course; if death were eventually to occur, it would be the result, primarily, of the underlying disease; and not the result of a self-inflicted injury. . . .

Recognizing the right of a terminally ill person to reject medical treatment respects that person's intent, not to die, but to suspend medical intervention at a point consonant with the "individual's view respecting a personally preferred manner of concluding life." The difference is between self-infliction or self-destruction and self-determination.

[*Id.* at 351, 486 *A.*2d 1209 (citations omitted).]

Relying on the common-law right of self-determination, we established two tests (the "limited-objective" best interests test and the "pure-objective" test) for use in determining whether life support may be terminated for individuals who are no longer competent to express their wishes. *Id.* at 365, 486 *A.*2d 1209.

Two years later, we employed the tests in a trio of cases that differed from *Conroy*. *In re Farrell, supra,* 108 *N.J.* at 335, 529 *A.*2d 404; *In re Peter,* 108 *N.J.* 365, 529 *A.*2d 419 (1987); and *In re Jobes,* 108 *N.J.* 394, 529 *A.*2d 434 (1987). In deciding those appeals, we again emphasized that "the fateful decision to withdraw life-supporting treatment is extremely personal. Accordingly, a competent patient's right to make that decision generally will outweigh any countervailing state interests." *In re Jobes, supra,* 108 *N.J.* at 426–27, 529 *A.*2d 434. Importantly, in recognition of the fundamental societal question involved, we called on the Legislature to set guidelines in respect of refusal of treatment. *In re Farrell, supra,* 108 *N.J.* at 342, 529 *A.*2d 404. Thirty-eight states already had enacted laws addressing the right to refuse treatment. *Id.* at 342 n. 2, 529 *A.*2d 404.

In 1991, the Legislature responded by enacting the "New Jersey Advance Directives for Health Care Act," which provides procedures and standards for the implementation of so-called "living wills" or "advance directives." *L.* 1991, *c.* 201. In its findings, the Legislature declared:

> This State recognizes, in its law and public policy, the personal right of the individual patient to make voluntary, informed choices to accept, to reject, or to choose among alternative courses of medical and surgical treatment.
>
> [*N.J.S.A.* 26:2H–54a.]

The Act is intended to prevent the loss of "the right to control decisions about one's own health care ... in the event a patient loses decision making capacity and is no longer able to participate actively in making his own health care decisions." *N.J.S.A.* 26:2H–54c. It enables "competent adults to plan ahead for health care decisions through the execution of advance directives, such as living wills and durable powers of attorney, and to have the wishes expressed therein respected." *Ibid.*

Thus, the public policy of this State, as developed by case law and through legislative enactment, clearly recognizes that an individual has the right to refuse devices or techniques for sustaining life, including the withholding of food and the removal of life

support. We turn then to examine the effect to be given to a victim's exercise of that right in the context of a homicide trial.

## III.

### A.

Defendant was charged with aggravated manslaughter, which, according to the New Jersey Code of Criminal Justice (Code), occurs when one "recklessly causes death under circumstances manifesting extreme indifference to human life." *N.J.S.A.* 2C:11–4a. The trial court charged the jury on aggravated manslaughter and the lesser-included offense of second-degree vehicular homicide, defined as "[c]riminal homicide ... caused by driving a vehicle or vessel recklessly." *N.J.S.A.* 2C:11–5a. Causation is an essential element of those homicide charges.

The Code defines "causation" as follows:

a. Conduct is the cause of a result when: (1) It is an antecedent but for which the result in question would not have occurred; and

(2) The relationship between the conduct and result satisfies any additional causal requirements imposed by the code or by the law defining the offense.

. . . .

c. When the offense requires that the defendant recklessly or criminally negligently cause a particular result, the actual result must be within the risk of which the actor is aware or, in the case of criminal negligence, of which he should be aware, or, if not, the actual result must involve the same kind of injury or harm as the probable result and must not be too remote, accidental in its occurrence, or dependent on another's volitional act to have a just bearing on the actor's liability or on the gravity of his offense.

[*N.J.S.A.* 2C:2–3.]

The causation requirement of our Code contains two parts, a "but-for" test under which the defendant's conduct is "deemed a cause of the event if the event would not have occurred without that conduct" and, when applicable, a culpability assessment. *State v. Martin,* 119 *N.J.* 2, 11–13, 573 *A.*2d 1359 (1990) (discussing Code changes); *see also* II *New Jersey Code: The Final Report of the New Jersey Law Commission* § 2C:2–3 commentary at 49–51 (1971) (II N.J.Code). Under the culpability assessment,

> [w]hen the actual result is of the same character, but occurred in a different manner from that designed or contemplated [or risked], it is for the jury to determine whether intervening causes or unforeseen conditions lead to the conclusion that it is unjust to find that the defendant's conduct is the cause of the actual result. Although the jury may find that the defendant's conduct was a "but-for" cause of the victim's death ... it may nevertheless conclude ... that the death differed in kind from that designed or contemplated [or risked] or that the death was too remote, accidental in its occurrence, or dependent on another's volitional act to justify a murder conviction.
>
> [*Martin, supra,* 119 *N.J.* at 13, 573 *A.*2d 1359.]

Our Code, like the Model Penal Code (MPC), does not identify what may be an intervening cause. *Martin, supra,* 119 *N.J.* at 12–13, 573 *A.*2d 1359. Instead, the Code "deals only with the ultimate criterion by which the significance of *such possibilities* ought to be judged." *Id.* at 13, 573 *A.*2d 1359 (quoting II N.J.Code § 2C:2–3 commentary at 50) (emphasis added). Removal of life support, as it relates to causation, should be judged only by the criteria of the Code, assuming that the law recognizes the possibility that removal can be an intervening cause. The dissent cites the text of *N.J.S.A.* 2C:2–3c and suggests that the reference to "another's volitional act" supports having the jury determine whether a crime victim's removal from life support constitutes an independent intervening cause. While "another's volitional act" undoubtedly would require a jury to consider whether, for example, a doctor's malpractice in treating a crime victim constituted an intervening cause that had broken the chain of causation after a criminal defendant's act, we do not believe, as the dissent suggests, that the Legislature intended the reference to "another's volitional act" to include a crime victim's decision to be removed from life support.

"Intervening cause" is defined as "[a]n event that comes between the initial event in a sequence and the end result, thereby altering the natural course of events that might have connected a wrongful act to an injury." *Black's Law Dictionary* (7th ed.1999). Generally, to avoid breaking the chain of causation for criminal liability, a variation between the result intended or risked and the actual result of defendant's conduct must not be so out of the

ordinary that it is unfair to hold defendant responsible for that result. Wayne R. LaFave & Austin W. Scott, Jr., *Handbook on Criminal Law* § 35 (1972); *see also Martin, supra,* 119 *N.J.* at 14, 573 *A.*2d 1359. A defendant may be relieved of criminal liability for a victim's death if an "independent" intervening cause has occurred, meaning "an act of an independent person or entity that destroys the causal connection between the defendant's act and the victim's injury and, thereby becomes the cause of the victim's injury." *People v. Saavedra–Rodriguez,* 971 *P.*2d 223, 225–26 (Colo.1998) (explaining Wharton's rule on intervening cause); *see generally* Charles E. Torcia, 1 *Wharton's Criminal Law* § 26 (15th ed.1993) (stating that independent intervening cause that defendant cannot foresee is sufficient to relieve defendant of criminal responsibility for homicide). The question we address, then, is whether the removal of the victim's life support may constitute, as a matter of law, an "independent intervening cause," the significance of which a jury may evaluate as part of a culpability analysis.

B.

The longstanding, clear policy of this State recognizes the constitutional, common-law, and now statutorily based right of an individual to accept, reject, or discontinue medical treatment in the form of life supporting devices or techniques. An ill or injured person has that personal right and is free to exercise it, at his or her discretion, directly or through a family member or guardian acting in accordance with the person's wishes. In other words, a person's choice to have himself or herself removed from life support cannot be viewed as unexpected or extraordinary.

Decisions from other jurisdictions have reasoned similarly and have held that removal of life support is not an independent intervening cause in varied, but related, settings.[4] Courts have

---

[4] The dissent misperceives our reference to these related out-of-state cases. A textual analysis of those states' penal codes is not relevant to their holdings that removal of life support did not constitute an independent intervening cause.

confronted whether a victim's removal from life support renders a homicide verdict against the weight of the evidence and have rejected the contention that there was insufficient evidence to support a conviction when the victim expired following his or her removal from life support. *See, e.g., State v. Fierro,* 124 *Ariz.* 182, 603 *P.*2d 74 (1979); *Porter v. State,* 308 *Ark.* 137, 823 *S.W.*2d 846 (1992); *People v. Saldana,* 47 *Cal.App.*3d 954, 121 *Cal.Rptr.* 243 (1975); *State v. Guess,* 44 *Conn.App.* 790, 692 *A.*2d 849 (1997), *aff'd,* 244 *Conn.* 761, 715 *A.*2d 643 (1998); *Johnson v. State,* 261 *Ga.* 236, 404 *S.E.*2d 108 (1991); *People v. Caldwell,* 295 *Ill.App.*3d 172, 229 *Ill.Dec.* 675, 692 *N.E.*2d 448 (1998); *Ewing v. State,* 719 *N.E.*2d 1221 (Ind.1999); *Carrigg v. State,* 696 *N.E.*2d 392 (Ind.Ct. App.), *transfer denied,* 706 *N.E.*2d 165 (Ind.1998); *Spencer v. State,* 660 *N.E.*2d 359 (Ind.Ct.App.1996); *State v. Meyer,* No. 01–1373, 2002 WL 1332798 (Iowa Ct.App. June 19, 2002); *People v. Bowles,* 461 *Mich.* 555, 607 *N.W.*2d 715 (2000); *State v. Olson,* 435 *N.W.*2d 530 (Minn.1989); *State v. Meints,* 212 *Neb.* 410, 322 *N.W.*2d 809 (1982); *People v. Laraby,* 244 *A.D.*2d 946, 665 *N.Y.S.*2d 180 (1997), *aff'd,* 92 *N.Y.*2d 932, 680 *N.Y.S.*2d 898, 703 *N.E.*2d 756 (1998); *People v. Velez,* 159 *Misc.*2d 38, 602 *N.Y.S.*2d 758 (Sup.Ct.1993); *State v. Johnson,* 56 *Ohio St.*2d 35, 381 *N.E.*2d 637 (1978); *Eby v. State,* 702 *P.*2d 1047 (Okla.Crim.App.1985); *Commonwealth v. Kostra,* 349 *Pa.Super.* 89, 502 *A.*2d 1287 (1985); *State v. Ruane,* 912 *S.W.*2d 766 (Tenn.Crim.App.1995); *Felder v. State,* 848 *S.W.*2d 85 (Tex.Crim.App.1992), *cert. denied,* 510 *U.S.* 829, 114 *S.Ct.* 95, 126 *L.Ed.*2d 62 (1993).

Thus, in *Bowles, supra,* the defendant contended on appeal that the State's evidence on causation was insufficient because "the victim's death was caused by the intervening cause of removal from life support systems that were required to sustain the life of the victim." 607 *N.W.*2d at 717. In its affirmance of the defendant's conviction, the Supreme Court of Michigan observed that "the implementation of a decision to terminate life-support treatment is not the cause of the patient's subsequent death. Instead, the discontinuance of life-support measures merely allows the patient's injury or illness to take its natural and inevitable course."

*Ibid.* (quotation omitted). The court concluded that the case involved "no separate intervening cause. Rather, we find in these facts only the unsuccessful efforts of the medical community to overcome the harm inflicted by the defendant, and the acceptance by the victim's family of the reality of the fatal injuries." *Id.* at 718.

Similarly, courts have denied requests by defendants for a jury instruction charging that a victim's removal from life support constitutes an independent intervening cause sufficient to relieve the defendant of criminal liability. *See, e.g., People v. Funes,* 23 *Cal.App.*4th 1506, 28 *Cal.Rptr.*2d 758 (1994); *In re J.N.,* 406 A.2d 1275 (D.C.1979); *State v. Yates,* 64 *Wash.App.* 345, 824 P.2d 519, *rev. denied,* 119 *Wash.*2d 1017, 833 P.2d 1390 (1992). In *Yates, supra,* because life support had been removed from one of the defendant's victims who had been in a persistent vegetative state following a gunshot wound to her head, the defendant argued that the jury should have been given the following instruction:

In determining whether or not [the victim] died as a result of the defendant's acts, the State has the burden of proving beyond a reasonable doubt that the removal of food and water was not a new independent cause of death.

[824 P.2d at 523.]

The court agreed with the trial court's rejection of the requested instruction, stating:

When life support is removed, the cause of death is not the removal, but whatever agency generated the need for the life support in the first instance. Here, then, the removal of food and water could not have been a legally cognizable cause of death, and the court properly refused the proposed instruction.

[*Ibid.* (citation omitted).]

The California Court of Appeals reasoned similarly in *Funes, supra,* when it held that the defendant was not entitled to an instruction on intervening causes because "as a matter of law, the decision to withhold antibiotics was not an independent intervening cause. Consequently, the court was not required to instruct on [that] issue." 28 *Cal.Rptr.*2d at 768. The court noted that a duty exists to instruct on an issue that is supported by the evidence, and conversely, that no such duty arises in respect of an issue unsupported by the evidence. *Ibid.* Because an independent

intervening cause absolving the defendant from criminal liability must be "unforeseeable" or an "extraordinary and abnormal occurrence," the Court concluded that on the facts of the case before it "the decision to withhold antibiotics was, as a matter of law, not an independent intervening cause. Instead, it was a normal and reasonably foreseeable result of defendant's original [criminal] act." *Id.* at 769. There was no other reasonable inference from the evidence; the removal of life support was determined not to be independent from the defendant's criminal act. *Ibid.* See also *People v. Olah,* 2000 WL 33418962 (Mich.Ct.App.) (affirming trial court's determination to charge jury that "[r]efusing medical treatment is foreseeable"), *appeal denied,* 463 *Mich.* 921, 619 *N.W.*2d 547 (Mich.2000). *Cf. Fecske v. State,* 757 *So.*2d 548 (Fla.Dist.Ct.App.), *rev. denied,* 776 *So.*2d 276 (Fla.2000) (holding that trial court erred in instructing jury that independent intervening cause could not be found as matter of law because malpractice was possible proximate cause of death); *Weir v. State,* 777 *So.*2d 1073 (Fla.Dist.Ct.App.), *rev. denied,* 796 *So.*2d 539 (Fla.2001) (distinguishing *Fecske,* and holding that trial court correctly instructed jury on preexisting condition that "alone would not excuse a defendant from guilt").

We agree with the widely recognized principle that removal of life support, as a matter of law, may not constitute an independent intervening cause for purposes of lessening a criminal defendant's liability. Removal of life support in conformity with a victim's expressed wishes is not a legally cognizable cause of death in New Jersey. See *In re Conroy, supra,* 98 *N.J.* at 351, 486 *A.*2d 1209. As aptly put by the District of Columbia Court of Appeals, "[t]he defendant's desire to mitigate his liability may never legally override, in whole, or in part, the decisions of the physicians and the family regarding the treatment of the victim." *In re J.N., supra,* 406 *A.*2d at 1282. Thus, both the trial court and the Appellate Division correctly concluded that defendant was not entitled to dismissal of the indictment for aggravated manslaughter on the basis that the removal of Patrick's life support consti-

tuted an independent intervening cause relieving defendant of criminal liability. *Pelham, supra,* 328 *N.J.Super.* at 639, 746 *A.*2d 557, *aff'd,* 353 *N.J.Super.* at 123–24, 801 *A.*2d 448. *See also State v. Watson,* 191 *N.J.Super.* 464, 467 *A.*2d 590 (App.Div.), *certif. denied,* 95 *N.J.* 230, 470 *A.*2d 443 (1983).

Removal of life-sustaining treatment is a victim's right. It is thus foreseeable that a victim may exercise his or her right not to be placed on, or to be removed from, life support systems. Because the exercise of the right does not break unexpectedly, or in any extraordinary way, the chain of causation that a defendant initiated and that led to the need for life support, it is not an intervening cause that may be advanced by the defendant. The question is whether it was impermissible for the trial court to have so instructed the jury. The Appellate Division viewed the trial court's instruction as, in effect, directing a verdict for the prosecution because the instruction constituted an improper comment on the quality of the evidence. That, the court concluded, impermissibly invaded the province of the jury. We disagree.

Causation is a factual determination for the jury to consider, but the jury may consider only that which the law permits it to consider. The purpose of the charge to the jury is to inform the jury on the law and what the law requires. *Martin, supra,* 119 *N.J.* at 15, 573 *A.*2d 1359 (stating "[jury] charge is a road map to guide the jury" and "the court must explain the controlling legal principles and the questions the jury is to decide"); *State v. Green,* 86 *N.J.* 281, 287–88, 430 *A.*2d 914 (1981) (observing that "trial court should explain to the jury in an understandable fashion its function in relation to the legal issues involved" and "[e]ntailed is a comprehensible explanation of the question that the jury must determine, including the law of the case applicable to the facts that the jury may find") (citing *Jurman v. Samuel Braen, Inc.,* 47 *N.J.* 586, 591–92, 222 *A.*2d 78 (1966) (stating that "court's instructions must outline the function of the jury, set forth the issues, correctly state the applicable law in understandable language, and plainly spell out how the jury

should apply the legal principles to the facts as it may find them")).

Our courts have recognized other circumstances in which a jury is not permitted to consider certain facts. For example, a defendant's criminal liability is not lessened by the existence in the victim of a medical condition that, unbeknownst to the defendant, made the victim particularly vulnerable to attack. *State v. Hofford*, 169 *N.J.Super.* 377, 404 *A.*2d 1231 (App.Div. 1979). The trial court here recognized as much when it correctly instructed the jury to that effect. Similarly, we now hold that a defendant's criminal liability may not be lessened by a victim's subsequent decision to discontinue life support. Therefore, although the trial court must be careful not to suggest that it is directing a verdict on causation, see *infra* at 467–68, 824 *A.*2d at 1092, here, the court's instruction viewed in its entirety informed the jury that it could not consider the victim's removal from life support as an intervening cause of his death so long as the death was the natural result of defendant's actions. That is, if defendant's actions set in motion the victim's need for life support, without which death would naturally result, then the causal link is not broken by an unforeseen, extraordinary act when the victim exercises his or her right to be removed from life support and thereupon expires unless there was an intervening volitional act of another, such as gross malpractice by a physician.[5] The trial court's statement was correct as a matter of law and its effect was not the equivalent of directing a verdict when the charge is read as a whole.

This case is not like *State v. Ingenito*, 87 *N.J.* 204, 213–14, 432 *A.*2d 912 (1981) (concluding that permitting operation of collateral estoppel would have effect of making finding for jury on element

---

[5] The dissent's parade of hypothetical applications of our holding suggests too much. *Post* at 471, 824 *A.*2d at 1095. We have before us facts involving this crime victim's termination of life support. It is on those facts and not unbriefed hypothetical sets of facts, that we decide this case.

of charged offense), or *State v. Ragland,* 105 *N.J.* 189, 195–96, 519 *A.*2d 1361 (1986) (finding that referring jury to its earlier verdict in severed trial on unlawful possession of weapon operated, in effect, as directed finding on element of offense). In this case, the court did not direct a verdict on causation; rather, the jury was instructed on what it could not consider as part of its determination of the causation question. Further, the jury properly was told that it could consider remoteness in respect of the length of time that passed between the date of the accident and the date on which Patrick expired after having been removed from life support (as well as the cause and progression of his medical complications). Thus, the jury could not consider removal as the cause of death when determining causation but it could consider whether the causal link was broken by remoteness in time of death.

## IV.

In conclusion, we hold that there was no error in instructing the jury that a victim's decision to invoke his right to terminate life support may not, as a matter of law, be considered an independent intervening cause capable of breaking the chain of causation triggered by defendant's wrongful actions. The judgment of the Appellate Division is reversed and the matter remanded to the trial court for reinstatement of the judgment of conviction.

ALBIN, J., dissenting.

"Hard facts make bad law" is an old saw and an apt description of the resolution of this appeal. In this vehicular homicide case, William Patrick, a sixty-six-year-old lawyer, suffered multiple devastating injuries when his car, which was stopped at a light, was rear-ended by this drunk-driving defendant. The majority opinion describes at length the victim's gruesome injuries, painful hospitalizations, and medical treatment. After the passage of five months during which his condition continued to deteriorate, Patrick, in accordance with his wishes, was taken off a ventilator, and died several hours later.

Defendant was charged with aggravated manslaughter in the death of Patrick and convicted of the lesser-included offense of vehicular homicide. The question before this Court concerns the charge to the jury in which the trial judge, in essence, directed a verdict on the element of causation. The judge instructed the jury that the removal of the ventilator was not "a sufficient intervening cause to relieve the defendant of criminal liability," provided that "defendant's actions set in motion the victim's need for life support" and the victim's "death was the natural cause of defendant's actions." In reversing defendant's conviction, the Appellate Division, in a thorough and thoughtful opinion by Judge Wallace, held that "the trial judge's instructions on intervening cause deprived defendant of the opportunity to have the jury decide the essential issue of causation." *State v. Pelham,* 353 *N.J.Super.* 114, 126, 801 *A.*2d 448 (App.Div.2002). I agree with Judge Wallace and add these words in dissent from the majority's decision.

Proof of causation is an element of every criminal offense and, until today, was no different from other elements that must be submitted to the jury. The *New Jersey Code of Criminal Justice* (Code) reserves to the jury the ultimate authority to determine whether intervening circumstances break the chain of causation of criminal culpability. In this case, the Code required the jury to determine whether the manner of Patrick's death, which followed from the voluntary removal of life support, was "too remote, accidental in its occurrence, or dependent on another's volitional act to have a just bearing on the actor's liability or on the gravity of his offense." *N.J.S.A.* 2C:2–3c. The general and broad language of that provision was intended to apply to the infinite number of variables that arise in the unique circumstances of each new case, including that of this defendant. Causation was a matter that the jury should have been trusted to decide correctly.

Instead, the majority ignores the statutory language that governs this case and imports into the law of causation its own moral and philosophical preferences as it departs from the bedrock

principle that a judge cannot direct a verdict against a defendant on an element of an offense, even where evidence of guilt appears overwhelming. *State v. Anderson,* 127 *N.J.* 191, 205, 603 *A.*2d 928 (1992). The majority has carved from the Code's broad language on causation an inflexible rule that, in all cases, a victim's termination of medical care to support life may never be considered an independent intervening circumstance capable of breaking the chain of causation. The majority has come to that conclusion because it finds that the victim's removal of life-sustaining treatment is always foreseeable.

I object not so much to the wisdom of that new rule of law, as to its failure to find any support in the text of the Code. The Code's drafters left to the jury the commonsense judgment of distinguishing those cases in which intervening circumstances "would have a just bearing on the actor's liability or on the gravity of his offense." *N.J.S.A.* 2C:2–3c. Our jurisprudence has traditionally deferred to the jury the delicate and difficult task of deciding the facts on which a defendant's guilt or innocence depends. *State v. Ingenito,* 87 *N.J.* 204, 211–12, 432 *A.*2d 912 (1981).

The majority's new rule is not only at odds with the Code and the fundamental right of an accused to have the jury decide each element of an offense, but will also have unanticipated consequences as it is reflexively applied to future cases. The jury will no longer be permitted to consider whether the chain of causation is broken in homicide cases where the victim refuses to take antibiotics or other benign medication necessary to sustain life without interfering with the enjoyment of life; where the victim declines a blood transfusion for religious or other reasons; or where the victim decides that he no longer wishes to continue using a medical device, such as a respirator or dialysis machine. The removal of a ventilator or the refusal to take medication or to allow a blood transfusion, all of which may be necessary to sustain life, may or may not, depending on the circumstances, "have a just bearing on the actor's liability or on the gravity of his offense," but the ultimate decision always has been one for the jury.

The application of a general rule, such as the Code's on intervening circumstances, necessarily will lead to varied outcomes, depending on the facts of a particular case. The understanding that two separate juries might decide the same case differently is an acknowledgement of the lack of perfection in our system of justice. That jurors, through their collective experience and humanity, are the conscience of the community is not a weakness, but a strength and the reason why, I suspect, we have not lost faith in the jury as the best means of delivering justice. In its quest for consistency, the majority sacrifices the patient application of a general rule intended to apply to particular facts to render a just result.

This case is not about a patient's right to self-determination, to decide the course of his medical treatment, including its termination, or the right to die with dignity. The majority conflates the right of the patient to self-determination with the right of the accused to have his case decided by a jury. A patient's right to refuse or terminate life-sustaining medical treatment is indisputable. *N.J.S.A.* 26:2H–53 to –78; *In re Conroy*, 98 *N.J.* 321, 347–55, 486 *A.2d* 1209 (1985). That right is not in conflict with a defendant's right to have a jury decide whether he should be held criminally liable for causing the death of a victim who elects to terminate his life. *U.S. Const.* amend. VI; *N.J. Const.* art. I, ¶ 9. The defendant and prosecutor have no standing to interfere with the patient's decision-making process regarding the course of his medical treatment. It is highly improbable that a crime victim would remain on life support solely for the purpose of assuring that a defendant who victimized him would not be charged with homicide. It is equally improbable that a victim would decline medical intervention for the purpose of assuring a homicide prosecution.

Our jurisprudence and the legislative histories of our Code and the *Model Penal Code* (MPC) provision upon which our criminal causation provision was patterned do not support the path taken by the majority. A defendant is not guilty of vehicular homicide

unless death "is *caused* by driving a vehicle ... recklessly." *N.J.S.A.* 2C:11–5a (emphasis added). Causation is a material element that must be proved by the State beyond a reasonable doubt. *N.J.S.A.* 2C:1–13a, –14h(1)(a), –14i; *N.J.S.A.* 2C:2–2.[1]

*N.J.S.A.* 2C:2–3 addresses the causation requirements of reckless homicide. First, the defendant's conduct must be a "but-for" cause of the victim's death. *N.J.S.A.* 2C:2–3a(1); *State v. Martin,* 119 *N.J.* 2, 11, 573 *A.*2d 1359 (1990). Second, because vehicular homicide requires that the defendant acted recklessly,

> the actual result must be within the risk of which the actor is aware or,
>
> ... if not, the actual result must involve the same kind of injury or harm as the probable result and must not be too remote, accidental in its occurrence, or dependent on another's volitional act to have a just bearing on the actor's liability or on the gravity of his offense.
>
> [*N.J.S.A.* 2C:2–3c.]

Our causation provision, although not identical to its MPC source, is firmly rooted in MPC § 2.03,[2] and has been construed

---

[1] *N.J.S.A.* 2C:2–2 provides, in relevant part, that "a person is not guilty of an offense unless he acted purposely, knowingly, recklessly or negligently, as the law may require, with respect to each material element of the offense." *N.J.S.A.* 2C:2–2a.

> A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.
>
> [*N.J.S.A.* 2C:2–2b(3).]

[2] MPC § 2.03(1) is identical to *N.J.S.A.* 2C:2–3a. MPC § 2.03(3), the source for *N.J.S.A.* 2C:2–3c and –3d, provides, in relevant part:

> (3) When recklessly or negligently causing a particular result is an element of an offense, *the element is not established if the actual result is not within the risk of which the actor is aware* or, in the case of negligence, of which he should be aware *unless:*
>
> (a) the actual result differs from the probable result only in the respect that a different person or different property is injured or affected or that the probable injury or harm would have been more serious or more extensive than that caused; or

by this Court accordingly. *See Martin, supra,* 119 *N.J.* at 11–19, 573 *A.*2d 1359 (construing *N.J.S.A.* 2C:2–3a and –3b consistently with their respective sources, MPC § 2.03(1) and (2)). The premise underlying each code's causation provision is that variations between the actual result of a defendant's conduct and that contemplated, designed, or probable under the circumstances are to be treated as "problems of culpability rather than metaphysical problems of causation." *Id.* at 11, 573 *A.*2d 1359. *See also* II *The New Jersey Penal Code, Final Report of the New Jersey Criminal Law Revision Commission* cmts. 1 & 3 on *N.J.S.A.* 2C:2–3 at 49–51 (1971) (N.J. Final Report); MPC § 2.03 cmt. 2 at 258 (1985); MPC § 2.03 cmts. 1 & 2 at 132 (Tentative Draft No. 4 1955) (MPC Tentative Draft). Both codes avoid the vague concept of "proximate cause," and focus on whether a remote result of which a defendant's conduct was a "but-for" cause "bears on the defendant's culpability for the offense." *Martin, supra,* 119 *N.J.* at 11, 573 *A.*2d 1359.

New Jersey is only one of two states that have adopted MPC § 2.03 and explicitly added the intervening volitional conduct of others as a factor to be considered in determining causation.[3] The inclusion of that factor in cases of human intervention is based on "deeply engrained common sense ideas about causality and responsibility," where the issue "properly turn[s] on the voluntariness of the intervening actor's conduct — to the extent that his intervention is independent and voluntary, the defendant's liability should be diminished." MPC § 2.03 cmt. 3 at 262. Moreover, only New Jersey has incorporated the term "just" bearing into its causation provision. Despite the American Law Institute's (ALI) debate on the wisdom of putting "undefined questions of justice to

---

(b) *the actual result involves the same kind of injury or harm as the probable result and is not too remote or accidental in its occurrence to have a [just] bearing on the actor's liability* or on the gravity of his offense. [MPC § 2.03(3) (Official Draft and Revised Comments 1985) (emphasis added).]

[3] *See Haw.Rev.Stat.* § 704–214 to –217 (1993); *N.J.S.A.* 2C:2–3.

the jury" by including the optional term "just" in its final MPC provision, our Code's drafters, by adopting that term, surely believed its proponents' rationale that its inclusion "ha[d] the merit of putting it clearly to the jury that the issue it must decide is whether ... it would be just to accord" significance to the actual result's remoteness, accidental quality, or dependence on another's volitional act in determining liability. MPC § 2.03 cmt. 3 at 261 n. 16.

*N.J.S.A.* 2C:2–3b and –3c "deal explicitly with variations between the actual result and that designed, contemplated or risked." N.J. Final Report, *supra*, cmt. 3 on *N.J.S.A.* 2C:2–3b, – 3c at 50. "The actual result is 'to be contrasted with the designed or contemplated [ ]or ... probable[ ] result *in terms of its specific character and manner of occurrence.'" Martin, supra,* 119 *N.J.* at 12, 573 *A.*2d 1359 (emphasis and alteration added) (quoting MPC, *supra*, § 2.03 cmt. 3 at 260 n. 13). "Thus, when the actual result occurs in the same manner and is of the same character as the designed or contemplated [or probable] result, the causation requirement is satisfied." *Ibid.* On the other hand, if the actual result does not occur in the same manner as the designed, contemplated, or probable result, " 'the culpability requirement is not established unless the actual result involved the same kind of injury or harm as that [probable,] designed or contemplated but the precise injury inflicted was different or occurred in a different way.'" *Ibid.* (quoting N.J. Final Report, *supra*, cmt. 3 on *N.J.S.A.* 2C:2–3b, –3c at 50–51). Our Code

makes no attempt to catalogue the possibilities, *e.g.*, to deal with the intervening or concurrent causes, natural or human; unexpected physical conditions; distinctions between the infliction of mortal or non-mortal wounds. It deals only with the ultimate criterion by which the significance of such possibilities ought to be judged, *i.e.*, that the question to be faced is whether the actual result is too accidental in its occurrence or too dependent on another's volitional act to have a just bearing on the actor's liability or on the gravity of his offense.

[N.J. Final Report, *supra*, cmt. 3 on 2C:2–3b, –3c at 50–51. *See also* MPC, *supra*, § 2.03 cmt. 3 on subsections (2)(b) and (3) at 261, 263–64.]

That formulation was chosen by the drafters of our Code in lieu of the ALI's rejected proposed alternative that a defendant would

be liable for an actual result that defendant knew or should have known was "rendered substantially more probable by his conduct." MPC, *supra*, § 2.03 cmt. 3 at 261 n. 17. The noted advantage of "putting the issue squarely to the jury's sense of justice," rather than couching the culpability issue in terms of a foreseeable substantial probability, "is that it does not attempt to force a result which the jury may resist. It also leaves the principle flexible for application to the infinite variety of cases likely to arise." N.J. Final Report, *supra*, cmt. 3 on 2C:2–3b at 50–51.

In sum, the drafters of our Code clearly contemplated, as previously recognized by this Court, that "[w]hen the actual result is of the same character, but occurred in a different manner ..., it is for the *jury* to determine whether intervening causes or unforeseen conditions lead to the conclusion that it is unjust to find that the defendant's conduct is the cause of the actual result." *Martin, supra*, 119 *N.J.* at 13, 573 *A*.2d 1359 (emphasis added). This is just such a case.

Here, as in *State v. Martin, supra*, 119 *N.J.* at 11, 573 *A*.2d 1359, defendant does not dispute that his conduct was a "but-for" cause of the victim's death. Instead, he claims that the State must prove the additional requirement of *N.J.S.A.* 2C:2–3c that he recklessly caused the actual result, *i.e.*, the victim's death, five months after the accident and two hours after the victim and his family elected to disconnect his ventilator. In order for this defendant to be guilty of vehicular homicide, the State must prove that the specific character and manner of the victim's death was either: (1) within the risk of which defendant was aware; or, (2) if not, then not "too remote, accidental in its occurrence, or dependent on another's volitional act to have a just bearing" on defendant's liability or the gravity of his offense. *N.J.S.A.* 2C:2–3c; *Martin, supra*, 119 *N.J.* at 12, 573 *A*.2d 1359.

The majority holds, in essence, that the risk that a victim will elect to reject or terminate some life-sustaining measure as a result of his injuries is, as a matter of law, within the risk of which defendants are aware. I part with the majority on this point.

Whether defendant was aware of the risk was a question for the jury. I do not doubt that under the circumstances of this case, a jury could have found that the manner of Patrick's death was not "too remote, accidental in its occurrence, or dependent on another's volitional act to have a just bearing" on defendant's liability. *N.J.S.A.* 2C:2–3c. However, by directing a verdict to the effect that the victim's decision to terminate his life was not a sufficient intervening circumstance to relieve defendant of criminal liability, the trial court deprived defendant of the right to have a jury decide the issue of causation. That ruling directly contravened the Legislature's intent that intervening circumstances be put "squarely to the jury's sense of justice." *See* N.J. Final Report, *supra,* cmt. 3 on 2C:2–3b at 50–51; *MPC, supra,* § 2.03 cmt. 3 at 261 n. 17. This Court's affirmance of that ruling eviscerates not only the right to trial by jury, but also the Legislature's intent that our causation provision be "flexible for application to the infinite variety of cases likely to arise." N.J. Final Report, *supra,* cmt. 3 on 2C:2–3b at 50–51.

Moreover, the majority's heavy reliance on other states' common-law proximate causation jurisprudence as support for its position is misplaced. Not one case cited by the majority interprets a causation provision similar to our own. Only twelve states have codified general statutory causation provisions. Three states have adopted the essential elements of MPC § 2.03 verbatim, and do not include *N.J.S.A.* 2C:2–3's additional requirements that the actual result of a defendant's conduct not be "too ... dependent on another's volitional act to have a just bearing" on his liability or on the gravity of the offense.[4] Three states have wholly rejected the MPC causation provision on which ours was patterned and instead rely solely on a draft provision of the *Final Report of the National Commission on Reform of Federal Criminal Laws* (Brown Commission) that "deals with only one aspect of the traditional problem of causation, indicating that if an act is a 'but-

---

[4] *See Del.Code Ann.* tit. 11, § 261 (2001); *Mont.Code Ann.* § 45–2–201 (2001); *Pa. Stat. Ann.* tit. 18 § 303 (West 1998).

for' or concurrent cause of a result causation 'may be found.'"[5] *See* MPC, *supra*, § 2.03 cmt. 5 at 264–65 & n. 23. Two states have adopted provisions incorporating the Brown Commission draft provision, along with provisions analogous to MPC § 2.03(3)(a), *supra* note 2.[6] Two states have adopted the MPC tentative draft alternative that the ALI ultimately rejected, and thus couch causation culpability in terms of whether the actual result was "foreseen or foreseeable as a substantial probability."[7] *See* MPC, *supra*, § 2.03 cmt. 3 at 261 n. 17. The majority's reliance on other jurisdictions' law of causation is thus not persuasive because those cases do not interpret our unique provision, which explicitly incorporates both the intervening volitional conduct of others and the jury's sense of justice as factors to be considered in determining a defendant's liability.

While asserting the hard-and-fast rule that a victim's decision "to terminate life support, may not, as a matter of law, be considered an independent intervening cause," *ante* at 468, 824 A.2d at 1093, the majority maintains that a remoteness assessment is viable pursuant to the Code. In approving the trial court's charge, the majority finds that "the jury could not consider removal as the cause of death when determining causation but it could consider whether the causal link was broken by remoteness in time of death." *Ante* at 468, 824 A.2d at 1093. Therefore, the majority must be suggesting that after a period of time, to be fixed by the jury, a victim's decision to terminate life support will not transform an aggravated assault into a homicide. The various

---

[5] *See Ark.Code Ann.* § 5–2–205 (Michie 1997) ("Causation may be found where the result would not have occurred but for the conduct of the defendant operating either alone or concurrently with another cause unless the concurrent cause was clearly sufficient to produce the result and the conduct of the defendant clearly insufficient."); *Me.Rev.Stat. Ann.* tit. 17–A, § 33 (West 1983) (same); *N.D. Cent.Code* § 12.1–02–05 (1997) (same).

[6] *See Ala.Code* § 13A–2–5 (1994); *Tex. Penal Code Ann.* § 6.04 (Vernon 2003).

[7] *See Ariz.Rev.Stat. Ann.* § 13–203 (West 2001); *Ky.Rev.Stat. Ann.* § 501.060 (Michie 1999).

factors set forth in the Code that were to have a "just bearing on the actor's liability or on the gravity of his offense" were not meant to be compartmentalized and detached from one another, but considered as a whole in reaching a just verdict. The drafters of the Code expected a jury to consider the interplay between remoteness and the volitional act of another as breaking the chain of causation. In making no allowance for the varied circumstances in which life support may be terminated by a victim, the majority does not permit the jury to consider the level of medical assistance required to sustain life, for example, whether the medical regimen is so burdensome as to deny even a minimal quality of life, or is relatively benign in comparison. The nature and scope of the medical care and the quality of life of the victim are factors that should be considered along with remoteness in determining whether intervening circumstances — the voluntary termination of life support — should have a just bearing on the outcome of the case.

Although the verdict in this case might well have been the same had the issue of intervening circumstances been submitted to the jury for its consideration, the Court's *per se* rule rewrites the Code's statutory provision on causation and directs a verdict on an element of an offense in violation of the defendant's right to trial by jury. For these reasons, as well as those expressed by the Appellate Division, I dissent.

Justice LONG joins in this opinion.

*For reversal and remandment*—Chief Justice PORITZ, COLEMAN, VERNIERO, LaVECCHIA and ZAZZALI—5.

*For affirmance*—Justices LONG and ALBIN—2.