106 N.J. Super. 226 (1969)
254 A.2d 812
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
SHIRLEY ANNE RISDEN, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued June 9, 1969.
Decided July 1, 1969.
*227 Before Judges GOLDMANN, KOLOVSKY and CARTON.
Mr. Martin L. Haines argued the cause for appellant (Mr. James Logan, Jr., attorney).
Mr. Myron H. Gottlieb, Assistant Prosecutor, argued the cause for respondent (Mr. Martin J. Queenan, Burlington County Prosecutor, attorney).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Defendant was indicted for the murder of her husband Darrell. There were two trials, the first abruptly terminated by the declaration of a mistrial (see *228 In re Logan, 52 N.J. 475 (1968)) and the second resulting in a verdict of guilty of murder in the first degree with recommendation of life imprisonment. The prosecution had not sought the death penalty. Defendant unsuccessfully moved for a new trial. This appeal followed.

I
On May 31, 1967 defendant returned to her Bordentown, N.J. home from a visit to relatives in Cincinnati. At about 3:30 or 4 P.M. of that day she and her baby visited a friend, Victoria Darnell, who confirmed defendant's suspicions that Darrell had been seeing a girl named Julie during her absence. Mrs. Darnell testified she told defendant that Darrell and Julie had been to a drive-in movie with her and her husband, and that the two had been "making out"  "petting real mad"  while there. Upon hearing this, defendant ran out of the house with the baby.
Lorraine Bulanowski, defendant's next-door neighbor, testified that she heard three shots from the Risden home at about 4 P.M. Some ten minutes later defendant came into her house with the baby and asked if she would watch the child for an hour or so. Mrs. Bulanowski inquired of defendant whether she fired the shots, and she said she had. Defendant then ran out of the place and drove off in an automobile the Risdens had borrowed while their car was being repaired at Art's Body Shop in Bordentown.
According to prosecution witness Kermit Messer, defendant drove into his gas station shortly after 4:30 P.M. and parked in front of a car in which were seated Gary Harold, a friend of her husband's, and Julia Ann Bagley. She got out of her car, pointed the gun at them, asked where her husband was, threatened to shoot if they interfered with her, and repeated the threat to Messer, who was told to keep his mouth out of her business. Upon driving away she told the trio that she was looking for her husband and his girlfriend, and if they saw Darrell to tell him she was going to kill him. Messer's testimony was confirmed by Harold and Miss Bagley.
*229 The testimony of Betty W. Hann completes the basic story as to the circumstances of the murder. She was passing Art's Body Shop on her way home at about 5 P.M. when she heard yelling. She stopped, turned and saw defendant, who was "hollering." After a moment or so Mrs. Hann started up the street, heard shots, turned around again, and saw Darrell Risden on the ground. Defendant was shaking a gun at him, telling him not to move. Mrs. Hann heard her say "You won't get away with it," calling him a "two-timing son-of-a-bitch."
Meantime, police officer Allen had driven upon the scene. Defendant told him not to get out of his car or she would shoot herself. She backed away from the body, began to cry, and then put the gun to her shoulder, fired and fell.
Both defendant and her husband were taken to St. Francis Hospital in Trenton. He died on the operating table. Defendant remained in the psychiatric ward until her subsequent release on June 19, 1967.
Defendant disclaimed any recollection as to what had occurred between the time she ran down the steps of the Darnell home until she awoke at the hospital, except that she vaguely remembered stopping at the Bulanowski home and leaving the baby there.
The defense was temporary insanity. The only expert medical witness called by defendant in support of her claim that she was insane when she shot her husband was Dr. Harrison F. English, an associate in psychiatry at St. Francis Hospital. He had been called in to see her on June 1, 1967 and arranged for her transfer to the psychiatric ward as a precaution against possible attempts at suicide. He saw her on seven occasions during her 19 days at the hospital. He testified that she was suffering from a mental illness, a "depressive reaction," at the time of the shooting, and that she did not then know "what she was doing and not knowing what she was doing, she couldn't have known whether it was right or wrong." At the time of her discharge on June 19 it was *230 felt that she had recovered from the mental illness found present on May 31.

II
In her brief defendant advances ten points in support of her argument for a new trial. We need consider only those basic to our reversal.
We agree with defendant that prejudicial error was committed in permitting Dr. Julio C. DelCastillo, a psychiatrist on the staff of the Trenton State Hospital, to testify as he did.
Defendant was at the State Hospital from February 29 to March 22, 1968. She had been sent there by the trial judge with the consent of defense counsel when the sheriff reported that she was acting strangely at the county jail. In doing so the trial judge told the prosecutor and defense counsel, in defendant's presence, that
"* * * there may be some beneficial purpose served by having the defendant removed for a thorough physical and emotional or neurotic mental examination to determine whether in fact her current state is such to render it unlikely that she is in a position to cooperate with her counsel in the prosecution of her case by way of defense, and the preparation of the same in the orderly and proper fashion that is to be expected when the same is reached in accordance with the trial schedule * * *."
Defense counsel concurred that it might be desirable to take whatever steps were necessary by way of physical or mental examination "to see if she is suffering from any mental disease or physical problem which needs action immediately." He continued:
"However, your Honor, I certainly would desire that it be specified that the results of these tests not be used in any way in the trial on the merits unless it is found that she is in such mental condition that she cannot stand trial at this time."
To this the trial judge replied that his primary purpose was to be certain that defendant could cooperate with counsel *231 and properly present her defense and participate in the hearing; otherwise, there could be no hearing. When the judge informed defense counsel that he could object, he replied that he did not object providing the examination was "for the purposes that your Honor has recited." Defendant was then asked whether she had any objection to such an examination, and her reply was that she had none so long as her trial was not postponed.
It is abundantly clear from the foregoing that the examination was for the limited purpose of testing defendant's ability to stand trial. This is buttressed by the trial judge's order of February 28, 1968 committing defendant to the Trenton State Hospital "for a complete mental, physical and neurological examination and diagnosis, pursuant to the provisions of R.S. 30:4-82, to determine her ability to stand trial and cooperate with counsel."
Dr. DelCastillo conducted the prescribed examination while defendant was at the State Hospital. In presenting him as a rebuttal witness, the prosecutor informed the court that he intended to use Dr. DelCastillo not merely for the limited purpose of determining defendant's mental condition at the time of his examination, but also for the purpose of determining her condition at some earlier date. Despite defense counsel's strenuous objection, the trial judge permitted Dr. DelCastillo to testify without restriction that his testimony be limited to defendant's condition at the time of the examination and her ability to stand trial and cooperate with counsel. The reasons for the position taken by the trial judge appear in what he said in the course of the colloquy following defense counsel's objection. Contrary to what clearly appears from the record, the judge believed that there was a "great measure of ambiguity" in the discussion attending the arrangement to have defendant examined at the State Hospital.
Again, contrary to the record, the judge observed that
*232 "* * * defense doctor, Dr. English, has an expressed opinion that this Defendant was suffering a mental illness at the time of the incident in question and continues to suffer a state of mental illness currently in an improved condition as against a complete recovery or words of that nature. I think his choice of words was that he preferred to view this as an improved condition as against complete clearance.
And, in light of those circumstances it appears to me that it is ever so more pertinent to have an expression to meet the observation of conclusion of continued mental disease and that it is quite pertinent and it is in the interest of somewhat fundamental justice that the inquiry be made as to what the continuing condition of this Defendant is. * * *"
The trial judge's memory of Dr. English's testimony was not accurate. Dr. English had testified that at the time of defendant's discharge from the hospital on June 19 "it was felt that she had recovered from her depression." He was then asked whether at the time of her discharge she had "recovered from the mental illness that you found to be present on May 31," and the answer was, "Yes." Later, on cross-examination, the following testimony was given:
"Q. Is she cured of this illness, this insanity?
A. We don't use the word `cured,' we say improved because people can always get a return of a condition. If a person has, for example, someone has schizophrenia and they have a remission of their symptoms we say they are improved, not cured because their symptoms might return, but at the present time I believe we could say she has recovered. I like the term recovered better than cured.
Q. Does she still have the disease?
A. No. She still has the type of personality that she has, but I don't think she has the disease, no, or at least I didn't think so when she left the hospital. I haven't seen her since then except just now."
Of further significance is the fact that Dr. H. Edward Yaskin, who testified for the State, when asked if he had an opinion with regard to defendant's mental condition on the day of the trial, answered, "I haven't examined the lady as of today, so I will not give any impression of opinion." Consequently at the time Dr. DelCastillo was called to the witness stand, the only psychiatric opinion available was that defendant did not have any continuing insanity: she was free of any insanity she might have previously suffered.
*233 The trial judge's final reason for permitting the DelCastillo testimony was that to exclude it would be contrary to the underlying philosophy that no "legitimate source of qualifying or relevant material to ascertain the defendant's state of mind" should be kept from the jury's consideration, "particularly where the defense psychiatrist says there is a continuing condition of the disease." The judge went on to say: "Further, it is a pertinent inquiry as to the defense of insanity in connection with one of the alternate verdicts that are available to the jury, they must determine what is her present state of mind."
In the course of his testimony Dr. DelCastillo was asked whether, as a result of his examinations of defendant at the State Hospital, he was "ever able to reach an opinion as to whether she had amnesia at any time." Over defense counsel's objection he was permitted to answer, "I may say that in the first day of the interview I had with her she appeared as having a good memory and no defects in memory whatsoever." At no time while she was at the hospital did she show any sign of mental disease. He said he could not make a medical determination as to whether she had amnesia on May 31, 1967, the date of the murder. Under further questioning by the prosecutor he stated that defendant did not show any memory impairment. He said he had examined her on more than one occasion with regard to the events of May 31. In reply to the question, "Now, what can you tell us with regard to her memory on the first occasion you questioned her with regard to May 31, 1967?" he answered, "She had good memory." All this testimony was given despite defense counsel's repeated and vigorous objections. Finally, on cross-examination, Dr. DelCastillo said that he had found defendant sane while she was at the State Hospital, with no evidence of psychosis.
As stated, the only purpose of having Dr. DelCastillo examine defendant was so that he might testify, if necessary, as to whether she was capable of standing trial, cooperating with her counsel, and properly presenting her defense. Accordingly, *234 unless her counsel challenged her ability to do so, or the trial judge wanted to be satisfied in his own mind that she could, the doctor should not have been called at all.
Dr. DelCastillo's testimony was not proper rebuttal. The trial judge knew, from what the prosecutor said, that the witness would be used for more than the limited purpose of testifying to defendant's mental condition at the time he examined her. He nonetheless ruled, contrary to the express stipulation which led to defendant's commitment and examination at the Trenton State Hospital, that the prosecution might explore defendant's mental condition at an earlier date, and this for the reasons he expressed and with which we find ourselves in disagreement. By allowing the doctor to testify as he did, the jury was permitted to infer that since defendant was sane at the time of the trial, she probably was sane at the time of the murder. Dr. DelCastillo's testimony was patently prejudicial to defendant's cause, for it challenged the testimony of defendant's expert, Dr. English, that she had no memory of the crucial events. It gave credence to the State's position that defendant was sane at the time she killed her husband.
We find no specific mention of Dr. DelCastillo's testimony in the charge given the jury. The trial judge referred generally to the psychiatric testimony, adding, "There is, you certainly have noted, a conflict of medical testimony and medical opinion and it is your responsibility to determine the credibility to be accorded thereto." However general the trial judge's comment on the psychiatric testimony, it helped validate Dr. DelCastillo as a witness. We conclude that the admission of the doctor's testimony constituted reversible error.

III
We find reversible error in the trial judge's preventing lay witnesses from testifying as to defendant's appearance and reactions on the afternoon of the murder. We agree with defendant that in view of the insanity defense, it was *235 important to give the jury a first-hand account of defendant's mental and emotional attitudes and reactions at a time close to the homicide itself. Such testimony was also of significance with respect to whether defendant was guilty of some lesser degree of homicide than first degree murder.
It has long been the law of this State that a lay witness "may state facts and express an opinion in respect to the sanity of a defendant." Clifford v. State, 60 N.J.L. 287, 289 (Sup. Ct. 1897); State v. Deegan, 133 N.J.L. 263, 270 (E. & A. 1945); and see Gretowski v. Hall Motor Express, 25 N.J. Super. 192, 196 (App. Div. 1953). The State so concedes but contends that the testimony of the lay witnesses was properly excluded because it would have diluted the testimony of the medical experts. We find no validity to that argument. Evidence Rule 56 runs directly contrary to the ruling of the trial judge. It reads:
"(1) If the witness is not testifying as an expert his testimony in the form of opinions or inferences is limited to such opinions or inferences as the judge finds (a) may be rationally based on the perception of the witness and (b) are helpful to a clear understanding of his testimony or to the determination of the fact in issue.

* * * * * * * *
(3) Testimony in the form of opinions or inferences otherwise admissible under these rules is not objectionable because it embraces the ultimate issue or issues to be decided by the trier of the fact."
The report of the New Jersey Supreme Court Committee on Evidence stated, in connection with the then proposed text, now officially adopted, that
"The test of Rule 56(1) is that a lay opinion should be admitted where it is rationally based on the witness' personal perception and where it is helpful to a clear understanding of the testimony or to the determination of the fact in issue. * * *"
And see 7 Wigmore on Evidence (3d ed. 1940), § 1974, p. 113.
The trial judge repeatedly excluded testimony by lay witnesses descriptive of defendant's appearance and reactions *236 at the critical time in question, for the reason that it represented a "conclusion." Thus, Gary Harold was not allowed to describe how defendant looked to him at the gasoline service station when she pointed the gun at him. The trial judge rejected defendant's offer of proof that in a statement Harold had given a detective he described her appearance as "Wild, mad. I was afraid to try to talk to her. No telling what she would do. Just wild, crazy."
The judge would not permit Mrs. Hann, who witnessed the shooting, to use the word "hysterically" in describing defendant. There was a like ruling to the use of the word "hysterical" when she was cross-examined. Officer Allen was not permitted to testify on cross-examination by the defense that when he saw defendant she was "in a rage" and "shaking all over."
The descriptions of defendant sought to be given by the several lay witnesses were at least as significant as the experts' testimony in helping the jury determine whether she was insane at the time of the murder and, if not, whether the verdict should be first or second degree murder or manslaughter.

IV
In light of our reversal, defendant's argument addressed to the manner in which the voir dire was conducted requires no further comment than that on the retrial the procedure called for by State v. Manley, 54 N.J. 259 (1969), will be followed.
The claim that the report and testimony of Dr. Yaskin, psychiatrist for the State, were received in a manner and under circumstances highly prejudicial to defendant may also be summarily disposed of. Defense counsel now has the report and therefore will not be disadvantaged, as he claims he was at trial, by the fact that the report was not made available to him although it had been in the hands of the prosecutor from the very beginning of the trial and was used by him in cross-examining defendant and her expert, Dr. English. *237 In using the report at the retrial of this case, the prosecutor must follow the injunction found in State v. Obstein, 52 N.J. 516 (1968), where the court said:
"A cautionary admonition must be given with regard to psychiatric examinations obtained by the State. Having in mind that the accused's statements to the doctors are admissible solely on the mental competency issue and not at all on guilt, they cannot be used by the prosecutor as avenues of further investigation on the issue of guilt. Any inculpatory evidence derived from such a source cannot be admitted at the trial." (at page 531)
We are of the opinion that the prosecutor's use of the Yaskin report in cross-examining Dr. English and defendant skirted the limits of this admonition.
Defendant also contends that the admission of the testimony of Sister Claire Jerome, of St. Francis Hospital, violated the Miranda rules and the patient-physician privilege. Sister Jerome was in the emergency room of the hospital when defendant was brought in. She was permitted to testify, over objection, that when she asked defendant for her name and "How did this happen?" defendant gave her name as Shirley Risden and said that she had shot her husband and herself. Sister Jerome noted this on the emergency report. Of course, what Sister Jerome said threw doubt on defendant's testimony that she did not remember the shooting incident. However, the testimony was properly allowed.
Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), does not apply. Defendant was not in police custody and what Sister Jerome asked was not a custodial interrogation. As for the claim that the patient-physician privilege was violated, there are two answers: (1) Sister Jerome did not stand in the relation of physician to defendant as patient, and (2) the patient-physician privilege was not created until July 19, 1968, when N.J.S. 2A:84A-22.2 became effective. Defendant was found guilty on May 31, 1968.

*238 V
We find no occasion to deal in detail with defendant's remaining arguments since there must be a retrial. We find without substance the claims addressed to the charge and the prosecutor's alleged improper interruption of defense counsel during summation. We further conclude that defendant was not denied her right to a fair trial because the trial was held before the same judge who had held defense counsel in contempt of court during the course of the initial trial.
The judgment of conviction is reversed and the case remanded for a new trial.