**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2145-16T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

GEORGE V. KWEDER, JR.,

    Defendant-Appellant.

_____

> Argued January 7, 2019 – Decided March 26, 2019
>
> Before Judges Messano and Gooden Brown.
>
> On appeal from Superior Court of New Jersey, Law Division, Camden County, Indictment No. 13-03-0919.
>
> Eric R. Breslin argued the cause for appellant (Duane Morris, LLP, attorneys; Eric R. Breslin and Amanda L. Bassen, of counsel and on the briefs; Jovalin Dedaj, on the brief).
>
> Linda A. Shashoua, Assistant Prosecutor, argued the cause for respondent (Mary Eva Colalillo, Camden County Prosecutor, attorney; Linda A. Shashoua, of counsel and on the brief).

PER CURIAM

On March 5, 2012, shortly after 5 p.m., defendant George Kweder was driving his pick-up truck westbound on the Atlantic City Expressway. Witnesses observed defendant's car darting in and out of traffic before veering slowly from the left lane to the right shoulder, where it collided with a Lexus parked on the shoulder with its flashers on. The collision pushed the Lexus ninety-five feet, down an embankment, and into a tree. The driver of the Lexus remained conscious for some time before succumbing to crush injuries.

Post-accident forensic investigation revealed that defendant's truck was traveling at sixty-six miles per hour shortly before impact, and that defendant never applied the brakes. Analysis of data from the Lexus revealed that the impact caused the car to accelerate from zero to forty-two miles per hour in two-hundredths of a second.

Defendant's truck flipped over several times before coming to a stop. Witnesses, including an emergency medical technician (EMT) and the first New Jersey State Police Trooper to arrive at the scene, Ricardo Delgado, all detected the odor of alcohol on defendant's breath. Defendant told Trooper Delgado that he did not know what happened, he was "out of it," and he was diabetic and had not taken his medicine that day. Empty and near-empty beer cans and bottles were found in the passenger compartment of defendant's truck. Defendant was

taken for medical treatment at a nearby hospital, where he consented to a blood draw; his blood alcohol concentration (BAC) level was .079.

A grand jury indicted defendant for one count of second-degree death by auto, N.J.S.A. 2C:11-5. The jury convicted defendant at trial, and the judge sentenced him to a seven-year term of imprisonment subject to the No Early Release Act, N.J.S.A. 2C:43-7.2.

On appeal, defendant raises the following issues for our consideration:

POINT I

DEFENDANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO A SPEEDY TRIAL.[1]

POINT II

THE TRIAL COURT IMPROPERLY PRECLUDED [DEFENDANT] FROM INTRODUCING HIS THEORY OF CAUSATION TO THE JURY.

POINT III

THE TRIAL COURT DENIED [DEFENDANT] HIS CONSTITUTIONAL RIGHT TO CONFRONT THE STATE'S EXPERT WITNESS THROUGH CROSS-EXAMINATION.

POINT IV

THE TRIAL COURT ERRED IN ADMITTING STATEMENTS MADE BY [DEFENDANT] TO

---

[1] We have eliminated the sub-points of the arguments.

3

A-2145-16T3

HEALTHCARE PROFESSIONALS IN CONNECTION WITH MEDICAL TREATMENT.

We have considered these arguments in light of the record and applicable legal principles. We remand to the Law Division for a hearing to consider and definitively rule on defendant's speedy trial argument raised in Point I. In all other respects, we affirm defendant's conviction.

I.

We consider the substantive arguments regarding the trial in reverse order.

A.

The judge held N.J.R.E. 104 hearings outside the presence of the jury regarding statements defendant made to EMT Cheryl Ehrman-Massey and Nurse Stephanie Hazelton. EMT Ehrman-Massey arrived at the scene shortly after the collision and spoke to defendant, who complained of head and arm pain. She described defendant as cooperative and appropriately responsive, and she rode with defendant to the hospital in an ambulance. EMT Ehrman-Massey detected alcohol on defendant's breath and asked if he had any alcoholic beverages during

the day.  Defendant answered affirmatively, saying he had six beers prior to the accident.[2]

Later at the hospital emergency room, Nurse Hazelton drew blood from defendant after receiving a "kit" from Trooper Delgado.  She recalled asking defendant general questions, including, what happened.  Defendant, who was coherent and answered the nurse's questions appropriately, said "he didn't remember what happened and . . . th[ought] he fell asleep."

After the conclusion of each N.J.R.E. 104 hearing, defense counsel objected to admission of the statements, asserting N.J.R.E. 506, the physician-patient privilege, applied.  Additionally, as to defendant's statement to Nurse Hazelton, defendant argued the questioning took place while he was in custody.  The judge rejected these arguments, and both witnesses testified to the

---

[2]  During cross-examination of Trooper Delgado, defense counsel played the recording from the trooper's motor vehicle recorder, which captured defendant telling the trooper at the scene that he was returning from "[g]etting our boat together," and he did not know what happened and was "completely out of it." At the hospital, defendant told Trooper Delgado that he had three beers at a tavern during lunch.

Defendant elected not to testify, but his brother told the jury that he and defendant had three beers during lunch at the tavern after both had spent the earlier part of the day cleaning their boat.  Defendant's brother stated that the beer cans and bottles found in defendant's truck were those removed from the boat.

A-2145-16T3

statements in front of the jury. Defendant essentially renews the arguments before us.

"The admission or exclusion of evidence at trial rests in the sound discretion of the trial court." State v. Willis, 225 N.J. 85, 96 (2016) (citing State v. Gillispie, 208 N.J. 59, 84 (2011)). "Because the invocation of privileges results in the loss of relevant evidence, 'courts . . . have long construed them narrowly in an attempt to promote, at once, the goals of the privilege and the truth[-]seeking role of the courts.'" State v. L.J.P., 270 N.J. Super. 429, 440 (App. Div. 1994) (quoting State v. Schreiber, 122 N.J. 579, 582-83 (1991)).

The physician-patient privilege does not apply to statements defendant made to EMT Ehrman-Massey. See N.J.R.E. 506(b) (preventing disclosure of a "confidential communication between patient and physician") (emphasis added); and N.J.R.E. 506(a) (defining "patient" and "physician"). Defendant acknowledges this in his brief, but urges us to expand the privilege to include all members of his "treatment team." See, e.g., State v. Smith, 307 N.J. Super. 1, 12-13 (App. Div. 1997) (suggesting physician-patient privilege may apply to communications between hospital patient and "treatment team"); State v. Phillips, 213 N.J. Super. 534, 543 n.5 (App. Div. 1986) (noting that the physician-patient privilege "should also protect confidential statements made to

6

a treating nurse, acting either as an agent under the supervision of a doctor or in her professional capacity").  We decline the invitation, as did the trial judge, because, as an intermediate court of appeal, such a significant expansion of the privilege is more appropriately the province of our Supreme Court.  Riley v. Keenan, 406 N.J. Super. 281, 297 (App. Div. 2009).

As to defendant's statements to Nurse Hazelton, we have held that direct communications by a patient to a nurse in a hospital emergency room (ER) do not constitute a "confidential communication between patient and physician." N.J.R.E. 506(b); see State v. Risden, 106 N.J. Super. 226, 237 (App. Div. 1969) (holding physician-patient privilege did not apply to exclude testimony of nurse in emergency room, who asked the defendant, "[h]ow did this happen?" and noted the answers in a report), modified on other grounds, 56 N.J. 27 (1970).  In Phillips, we held that the privilege did not protect communications between the defendant and attending physicians and a nurse drawing blood when overheard by a police officer in attendance.  213 N.J. Super. at 541-43.  Moreover, N.J.R.E. 506(a) defines a "patient" as one who "for the sole purpose of securing preventative, palliative, or curative treatment, or a diagnosis preliminary to such treatment, . . . consults a physician, or submits to an examination by a physician[.]"  Trooper Delgado specifically tasked Nurse Hazelton with drawing

7

blood for a potential prosecution of defendant, so communications between her and defendant were not within the scope of the privilege. Phillips, 213 N.J. Super. at 542-43.

In sum, there was no error in admitting these statements for the jury's consideration.

B.

Throughout several of the many pre-trial proceedings, the parties and the judge discussed whether defendant intended to produce a medical expert who would link his diabetic condition to the accident. Ultimately, defendant did not retain a medical expert. During one of the pre-trial conferences, counsel said he only intended to call the ER doctor as a witness. He expected the doctor to testify that blood tests performed at the hospital revealed defendant was diabetic and was suffering from hyperglycemia.

In anticipation of trial, defendant submitted proposed jury instructions on causation that required the jury to consider whether defendant's reckless conduct caused the accident, or whether it "was instead caused by an emergent medical condition of [defendant] . . . ." Noting the lack of any defense expert report, the

judge refused to give the charge until he conducted a N.J.R.E. 104 hearing to evaluate the ER doctor's testimony.[3]

The State's final witness at trial was Thomas Brettell, an expert in forensic chemistry and forensic toxicology. Brettell opined that defendant's BAC ranged from .07 to .09 at the time of the accident and would have been at its highest point between 4:30 p.m. and 5:30 p.m. On cross-examination, Brettell stated that some diseases might affect the rate of alcohol absorption, but diabetes does not.

Defense counsel read a passage from a medical treatise that Brettell cited in his expert report. The passage stated, "[a]ny medication that alters the rate of metabolism can affect blood alcohol levels" and "any condition that causes 'extra cellular' water retention (. . . diabetes, for example) will alter results."[4] The prosecutor objected.

At side bar, defense counsel argued it was proper to ask Brettell about the passage because, even though the expert knew from defendant's medical records about the finding of hyperglycemia, Brettell failed to include it in his expert

---

[3] Defendant never called the ER doctor as a witness either.

[4] The treatise is not part of the appellate record. The trial transcript did not contain quotation marks within counsel's question, but the context gives us assurance it was a quote from the textbook.

report.  Defense counsel indicated he had no other questions for Brettell in this regard.

The judge reasoned, "the fact that [defendant is] a diabetic, there is nothing in the record that establishes that has anything to do with this case at all."  The judge further explained, "even if [Brettell] saw in the records that [defendant] was a diabetic, [Brettell] does not have the qualifications [of] a medical doctor."  The judge sustained the objection and did not permit further questions or readings from the treatise.  The following day, the judge told the jury to disregard what defense counsel had read from the textbook.

Defendant argues that the judge's ruling denied his constitutional right to cross-examination and requires reversal.  We agree the ruling was a mistaken exercise of discretion, but any error was harmless.

Cross-examination "should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness."  N.J.R.E. 611(b).  N.J.R.E. 705 specifically permits questioning of an expert regarding "underlying facts or data" considered in forming his or her opinion.  Our courts have long recognized the ability to use learned treatises as tools for cross-examining experts.  See Jacober v. St. Peter's Med. Ctr., 128 N.J. 475, 486-87 (1992).

A-2145-16T3

Here, Brettell's expert opinion, i.e., that defendant's BAC was likely .09 at the time of the accident, was critical evidence. He apparently cited this particular treatise in his expert report[5] and acknowledged that some diseases could affect alcohol absorption rates. The learned treatise Brettell cited rebutted his answer on cross-examination, that diabetes was not such a disease. The proposed cross-examination was entirely proper.

Moreover, although defense counsel never sought to admit the statement from the treatise as substantive evidence, the learned treatise exception to the hearsay rule, N.J.R.E. 803(c)(18), provides:

> To the extent called to the attention of an expert witness upon cross-examination or relied upon by the expert in direct examination, statements contained in published treatises, . . . on a subject of . . . medicine, or other science or art, established as a reliable authority by testimony . . . . If admitted, the statements may not be received as exhibits but may be read into evidence . . . .

Brettell himself recognized the authority of the treatise. Had counsel sought its admission, the passage would have properly been in evidence.

Whether the erroneous limitation on cross-examination compels reversal requires us to "decide whether the trial court's error was 'harmless beyond a reasonable doubt.'" State v. Bass, 224 N.J. 285, 307-08 (2016) (quoting Del. v.

---

[5] We say apparently because the report is not part of the appellate record.

Van Arsdall, 475 U.S. 673, 684 (1986)). We disregard an error by the trial court "unless it is of such a nature as to have been clearly capable of producing an unjust result." Id. at 308 (quoting State v. Castagna, 187 N.J. 293, 312 (2006)). "The possibility that the error led to an unjust result 'must be real, one sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached.'" Ibid. (quoting State v. Lazo, 209 N.J. 9, 26 (2012)).

Here, preventing the jury from hearing Brettell acknowledge that the treatise contradicted his earlier opinion was harmless beyond a reasonable doubt because no evidence was presented that defendant's hyperglycemic condition actually influenced the BAC reading or otherwise affected defendant's driving. Without such evidence, permitting defense counsel to read from the textbook and ask a follow-up question of Brettell would have had marginal impeachment value. Especially since defendant called his own expert at trial, Dr. Richard Saferstein, who directly contradicted Brettell's conclusion about defendant's BAC at the time of the crash, but was never questioned about the effect of diabetes on BAC.

Any error in foreclosing defense counsel's reading from the treatise does not require reversal.[6]

## C.

The model jury charge on causation provides in relevant part:

> Causation has a special meaning under the law. To establish causation, the State must prove two elements, each beyond a reasonable doubt:
>
> First, but for the defendant's conduct, the result in question would not have happened. In other words, without defendant's actions the result would not have occurred.
>
> . . . .
>
> Second, [for reckless conduct] that the actual result must have been within the risk of which the defendant was aware. If not, it must involve the same kind of injury or harm as the probable result and must also not be too remote, too accidental in its occurrence

---

[6] Dr. Saferstein filed a supplemental report, included within the appellate record, in support of defendant's earlier motion to dismiss the indictment. That report noted defendant's diabetic condition. Dr. Saferstein opined, "The symptoms associated with hyperglycemia can readily be mistaken with those symptoms associated with alcohol-induced intoxication." The report, however, did not address the effect of diabetes or hyperglycemia on BAC levels. At trial, defense counsel limited his questioning of Dr. Saferstein, who was not a medical doctor, to defendant's BAC at the time of the crash, and why the jury should reject Brettell's opinion. The decision not to present evidence connecting intoxication-like symptoms to defendant's diabetes was consistent with defense counsel's closing argument, in which he contended defendant's demeanor at the crash scene and hospital belied the State's assertion that defendant was intoxicated and his driving impaired.

A-2145-16T3

> or too dependent on another's volitional act to have a just bearing on the defendant's liability or on the gravity of his/her offense.
>
> [Model Jury Charges (Criminal), "Causation (N.J.S.A. 2C:2-3)" (approved June 10, 2013) (emphasis added).]

As already noted, defendant submitted a proposed jury charge on causation before trial. The proposed charge anticipated the introduction of evidence that the victim parked his car on the shoulder to answer a cellphone call, not because of an emergency. Defense counsel argued this violated N.J.A.C. 19:2-3.6, which generally prohibits "[p]arking . . . or stopping . . . on the [Atlantic City] Expressway, except . . . in cases of emergency," defined as "when the vehicle in question is physically inoperable or unable to be operated safely, or when the driver of the vehicle is ill or fatigued . . . . " N.J.A.C. 19:2-3.6(a) and (c). The proposed charge on causation asked the jury to consider whether the victim's "volitional act," i.e., illegally parking on the shoulder, was "an intervening cause of this accident that relieve[d] . . . defendant of criminal liability . . . ."

The State objected, arguing generally that the position of the victim's car and whether it was parked illegally was irrelevant to the issue of causation. Relying primarily on State v. Buckley, 216 N.J. 249 (2013), the judge agreed and entered an order memorializing his decision.

A-2145-16T3

In his opening statement, the prosecutor said the victim parked his car "safely" on the shoulder. Defendant sought reconsideration of the judge's prior order, claiming the State "opened the door." The judge denied the request.

In his final instructions, the judge's charge on causation was limited to the following: "In order to find that the defendant caused [the victim's] death, you must find that [the victim] would not have died but for defendant's conduct." The judge never provided the portion of the model charge emphasized above, but, instead, immediately followed by charging the jury on recklessness. See N.J.S.A. 2C:11-5(a) (defining the crime as "[c]riminal homicide . . . caused by driving a vehicle . . . recklessly."). Although the judge noted before he began defense counsel's continuing objection based on the court's refusal to provide the proposed charge, there was no contemporaneous objection from defense counsel to the charge as given.

Defendant argues it was error to exclude evidence of the victim's regulatory violation, particularly after the prosecutor's opening statement. He also contends the judge's charge erroneously removed from the jury's consideration an essential element of causation when an element of the offense is reckless conduct.

In Buckley, the defendant-driver was charged with death by auto after he collided with a utility pole, causing the death of his passenger. 216 N.J. at 257-58. The issue before the Court, on interlocutory appeal, was whether the defendant could introduce evidence of alleged intervening causes, i.e., the victim was not wearing a seat belt and the placement of the utility pole, which violated Department of Transportation standards. Id. at 259. The Court considered whether this evidence was relevant to recklessness and causation. Id. at 262.

The Court noted that "[w]hile '[c]ausation is a factual determination for the jury to consider . . . the jury may consider only that which the law permits it to consider.'" Id. at 263 (second alteration in original) (quoting State v. Pelham, 176 N.J. 448, 466 (2003)). The jury must first determine "whether the State has established 'but for' causation . . . that the event would not have occurred absent the defendant's conduct" of driving in the manner that he did. Ibid. (citing N.J.S.A. 2C:2-3(a)). "In cases involving the mens rea of recklessness, the jury then conducts a 'culpability assessment' under N.J.S.A. 2C:2-3(c)." Id. at 263-64 (citing Pelham, 176 N.J. at 460).

N.J.S.A. 2C:2-3(c) provides in relevant part:

> When the offense requires that the defendant recklessly . . . cause a particular result, the actual result

must be within the risk of which the actor is aware . . . or, if not, the actual result must involve the same kind of injury or harm as the probable result and must not be too remote, accidental in its occurrence, or dependent on another's volitional act to have a just bearing on the actor's liability or on the gravity of his offense.

[(Emphasis added).]

"As the drafters of the Code noted, N.J.S.A. 2C:2-3(c) 'deal[s] explicitly with variations between the actual result' and the result risked in a recklessness case, and 'stat[es] when the variation is not material.'" Buckley, 216 N.J. at 264 (quoting II The New Jersey Penal Code: Final Report of the New Jersey Criminal Law Revision Commission, commentary to § 2C:2-3, at 50 (1971)).

When considering

the first component of N.J.S.A. 2C:2-3(c)'s two-pronged test for causation: whether 'the actual result' was 'within the risk of which the actor is aware[,]'. . . the jury will determine whether [the] defendant was aware that, by virtue of the manner in which he drove the vehicle, he created a risk of a fatal collision. If the jury determines that [the] defendant was aware that his conduct gave rise to such a risk, it need not assess the exact degree of that risk, or the variables that could affect its magnitude.

[Id. at 267-68 (citations omitted).]

Under the second prong, "when permitted by the law, 'it is for the jury to determine whether intervening causes or unforeseen conditions lead to the

17                                                                        A-2145-16T3

conclusion that it is unjust to find that the defendant's conduct is the cause of the actual result.'" Id. at 265 (quoting Pelham, 176 N.J. at 461) (emphasis added). "An 'intervening cause' occurs when an event 'comes between the initial event in a sequence and the end result, thereby altering the natural course of events that might have connected a wrongful act to an injury.'" Ibid. (quoting Pelham, 176 N.J. at 461).

For our purposes, we focus on the Buckley Court's discussion of whether the placement of the utility pole was relevant to the jury's consideration of the defendant's recklessness or causation. In this case, defendant's argument is that the victim's illegally parked car — similar to the improperly placed pole — was an intervening cause. The Court first noted the placement of the pole was irrelevant to the jury's "but for" determination under N.J.S.A. 2C:2-3(c). Id. at 269.

> Second, under the first prong of N.J.S.A. 2C:2-3(c), the jury's determination of whether a fatal accident was "within the risk of which [defendant was] aware" does not, as a matter of law, implicate a particular utility pole's compliance with [Department of Transportation] recommendations. The question of defendant's awareness that his driving posed a risk of a fatal accident bears no nexus to the precise placement of a single utility pole, one among many structures and other stationary objects located near the road on which he drove on the day of the accident.

[Id. at 270.]

So, too, in this case, defendant's reckless driving posed the risk of accident to all cars on the road, not only the victim's car parked on the shoulder. The cases cited by defendant compel no different result. Therefore, the judge properly denied admission of the evidence regarding regulatory violations.

Additionally, defendant's argument that the prosecutor's opening statement "opened the door" to admit this evidence lacks sufficient merit to warrant discussion. R. 2:11-3(e)(2). It follows that the judge did not err by deciding not to provide defendant's proposed charge on causation.

We are troubled, however, by the judge's failure to provide the model jury charge's causation instruction that explains the first prong of N.J.S.A. 2C:2-3(c), i.e., "that the actual result must have been within the risk of which the defendant was aware." Model Jury Charges, at 1. However, the judge followed his truncated instruction on causation with a full and complete charge on recklessness. The charge advised the jury that the State needed to prove beyond a reasonable doubt that "defendant was aware that he was operating a vehicle in such a manner or under such circumstances as to create a substantial and unjustifiable risk of death to another." As noted, there was no objection to the charge as given. Under these circumstances, we have no doubt the jury

understood the essential principles of recklessness and causation. Any error did not have the clear capacity to produce an unjust result. R. 2:10-2.

We affirm defendant's conviction.

## II.

The State filed a complaint against defendant on August 23, 2012, more than five months after the accident. A grand jury did not indict defendant until March 2013, nearly seven months after that. At arraignment in June, the judge set a discovery end date of August 15, 2013.

Motion practice by defendant and the State followed. Defendant moved to dismiss the complaint, arguing the State had not provided access to the vehicles to permit his expert's investigation, and the prosecutor failed to provide the grand jurors with evidence of defendant's diabetes, which, according to Saferstein's supplemental report, may have mimicked intoxication-like behavior. By the time the motion was argued, in January 2014, defense counsel acknowledged his expert had inspected the vehicles. The judge denied the motion to dismiss, as well as defendant' motion for reconsideration, by order in March 2014.

During an April 2014 hearing, defendant moved to restore his driver's license, which had been forfeited as a condition of bail. The judge granted that

application. At the same hearing, the State sought a delay in trial to furnish its expert report.[7] Defendant objected, noting he had supplied the State with two expert reports, "one on the topic of extrapolation, another on the topic of the medical condition and hyperglycemia" as of December 2012. The prosecutor argued the State's expert report was necessary, "given what came up in the motion to dismiss." The judge noted the delay would not prejudice defendant, since it was unlikely that the case could be tried for several months; he granted the State's request to furnish its expert report in four weeks.

The parties were again before the judge in May, after the State had served its expert report. Noting "the State ha[d] been dragging its legs in this . . . matter" and "was lapsed [sic] in what they were doing[,]" the judge nevertheless ruled the State could use the report at trial, noting a likely fall trial date. Defendant asked for a two-week delay to address the State's expert report. The judge noted that a short delay would not matter because defendant had filed an interlocutory appeal of his decision to extend discovery and "until the Appellate Division makes a ruling, we're in limbo. If they . . . determine I was incorrect,

---

[7] The prosecutor never named the proposed expert nor did he identify the subject of the report.

then it's going to dismiss the indictment. So, I really . . . have to wait for that." We ultimately denied defendant's interlocutory application.

The judge conducted a pre-trial conference on May 20, 2014, during which defendant rejected the State's plea offer, and the judge set a trial date of October 6, 2014. The trial did not start, and the record is silent as to any court proceedings thereafter until June 19, 2015. The State had filed a motion to reopen discovery and compel production of defendant's medical records, and defendant had filed a motion to bar portions of Brettell's report. The judge originally handling the case had retired, so a second judge heard argument on the respective motions.

The judge queried why the State had delayed seeking to compel production of defendant's medical records. The prosecutor conceded that the motion should have been filed two years earlier, before he began handling the matter, but argued that defendant had placed his medical condition — diabetes — in issue by "hir[ing] an expert[,]" Dr. Saferstein.

Defense counsel opposed the motion, claiming defendant "has been consistently asserting his right to a speedy trial." He also told the judge "Saferstein is not an expert on diabetes, and Saferstein is not gonna be permitted . . . to testify about diabetes. Saferstein's report was for the purpose of

22

extrapolation." Defense counsel clarified that he planned to call the ER doctor to discuss defendant's medical condition on the date of the accident. The judge recognized defendant's "speedy trial" rights "are real at this point," and, although he was "[n]ot suggesting that defendant's been denied that[,]" he chastised the prosecutor for not acting sooner. The judge reserved on the motions and invited the parties to file further submissions.

On July 10, 2015, the judge denied the State's motion to compel production of defendant's medical records given defense counsel's representation that defendant would not assert his medical condition as a defense. The judge again reserved on defendant's motion to bar portions of Brettell's report. In a subsequent order, the judge set October 26, 2015, as the new trial date.

On October 26, 2015, the parties were again before the judge. Citing defendant's witness list, which included the ER doctor, the prosecutor asked the judge to reopen discovery to permit the State to retain and call an expert at trial "to rebut . . . any diabetes defense that may come out during trial." Despite the judge's earlier order, the State had obtained an order in September from the

Criminal Presiding Judge permitting it to obtain defendant's medical records.[8] The State also hired an expert, whose report, according to the prosecutor, asserted "diabetes doesn't really have anything . . . to do with this."

Obviously exasperated, the judge stated, "we've conferenced this matter at least a couple of times and I've been told at least once that diabetes isn't in the case." He asked defense counsel whether he planned to ask the ER doctor whether hyperglycemia could mimic intoxication. Counsel responded, "[I] could ask him that." Defense counsel asserted that if the court granted the State's motion, he would also seek to retain an expert who would opine that defendant passed out at the wheel because he was hyperglycemic.

Noting it was now thirteen months since the first judge had ruled on the diabetes issue, the judge said, "we're still kicking this thing around," and again expressed concern about speedy trial rights. He granted the State's request, gave defendant sixty days to obtain another expert, and adjourned the trial to February 2016.

The record again fails to disclose what delayed the trial in February. However, the second judge was reassigned to another division in the interim,

---

[8] The circumstances that led to this order are unexplained in the record, and there is no transcript from any proceedings before the Criminal Presiding Judge.

and, on July 22, 2016, the parties appeared before the trial judge for the first time. The record only reflects the results of a conference held in chambers, with the judge setting dates for the State's motions, a date for service of defendant's expert's report and a firm trial date of September 19.[9]

Again, for reasons unexplained by the record, the case did not proceed to trial in September. On November 17, 2016, the trial judge entered an order reaffirming the second judge's ruling of October 2015, i.e., that the State was permitted to rebut by expert testimony "any [d]iabetes [d]efense raised at [t]rial." As already noted, defense counsel never retained a medical expert, nor did defendant call the ER doctor as a witness. Trial commenced on December 6, 2016.

Defendant argues the forty-five month delay between indictment and trial violated his constitutional right to a speedy trial.[10] The State counters by contending much of the delay, indeed the last fourteen months before the start of trial, was solely attributable to defense counsel's obfuscation regarding what role, if any, evidence of defendant's medical condition would play at trial.

---

[9] The transcript does not identify the nature of the State's motions.

[10] The right to a speedy trial "attaches upon defendant's arrest." State v. Tsetsekas, 411 N.J. Super. 1, 8 (App. Div. 2009).

In State v. Cahill, the Court reiterated "that the four-factor balancing analysis of Barker v. Wingo, 407 U.S. 514 (1972), remains the governing standard to evaluate claims of a denial of the federal and state constitutional right to a speedy trial . . . ." 213 N.J. 253, 258 (2013). Those four factors are: "length of the delay, reason for the delay, assertion of the right by a defendant, and prejudice to the defendant." Id. at 264 (citing Barker, 407 U.S. at 530). "None of the Barker factors is determinative, and the absence of one or some of the factors is not conclusive of the ultimate determination of whether the right has been violated." Id. at 267 (citing Barker, 407 U.S. at 533). "[T]he factors are interrelated, and each must be considered in light of the relevant circumstances of each particular case." Tsetsekas, 411 N.J. Super. at 10 (citing Barker, 407 U.S. at 533).

When a delay exceeds one year, the court presumptively should analyze the remaining Barker factors, however, longer delays may be tolerated for serious offenses or complex prosecutions. Cahill, 213 N.J. at 265-66. "Barker's second prong examines the length of a delay in light of the culpability of the parties." Tsetsekas, 411 N.J. Super. at 12 (citing Barker, 407 U.S. at 529). Trial courts, in reviewing "the chronology of the delay," should "divid[e] the time into discrete periods of delay" and attribute each delay to the State, the defendant or

26

the judiciary. State v. May, 362 N.J. Super. 572, 596 (App. Div. 2003). Of course, purposeful delay tactics weigh heavily against the State, Tsetsekas, 411 N.J. Super. at 12, while "[d]elay caused or requested by the defendant is not considered to weigh in favor of finding a speedy trial violation." State v. Farrell, 320 N.J. Super. 425, 446 (App. Div. 1999) (citing State v. Gallegan, 117 N.J. 345, 355 (1989)).

While a defendant is under no obligation to assert his speedy trial rights, "'[w]hether and how a defendant asserts his right is closely related' to the length of the delay, the reason for the delay, and any prejudice suffered by the defendant." Cahill, 213 N.J. at 266 (quoting Barker, 407 U.S. at 531). A defendant's assertion of his right to a speedy trial is "entitled to strong weight when determining whether the [S]tate has violated the right[,]" ibid., and, conversely, his delay or failure to assert the right weighs "against any determination that the right was violated . . . ." May, 362 N.J. Super. at 598.

"The only remedy" for a violation of a defendant's right to a speedy trial "is dismissal of the charge." Cahill, 213 N.J. at 276. On appeal, "we reverse only if the court's determination is clearly erroneous." Tsetsekas, 411 N.J. Super. at 10 (citing State v. Merlino, 153 N.J. Super. 12, 17 (App. Div. 1977)).

Here, although there was a lengthy delay between defendant's arrest and trial, the reasons for the delay were innumerable and seemingly attributable to both sides. As noted, both the first and second judges took note of the delays in the context of defendant's right to a speedy trial, but neither engaged in the analysis we outlined above or made a ruling on the issue. Indeed, the second judge stated unequivocally that he was not making a finding that the State had violated defendant's speedy trial rights. In short, having never made a ruling, we have no ability to consider whether the judges exercised their discretion appropriately, or in a clearly erroneous manner.

We are unable to review this record anew and exercise original jurisdiction to decide the question ourselves. R. 2:10-5. As noted, the reasons for vast chunks of time between proceedings prior to trial are unexplained by the record.[11] Defendant's appellate brief argues that he formally asserted his right to a speedy trial, citing briefs apparently filed in the trial court. Although Rule 2:6-1(a)(2) generally prohibits including those briefs in the appellant's appendix, an exception is made where "the question of whether an issue was

---

[11] Defendant's appendix contains Promis Gavel docket entries for numerous dates that are not contained in any transcripts provided. Some of those entries explain there was incomplete discovery or that a witness was missing, but we have no ability to verify the reasons behind the entries.

28

raised in the trial court is germane to the appeal . . . ."  However, the appellate record does not include those briefs.  We acknowledge that defense counsel orally referenced defendant's speedy trial rights during several of the transcribed sessions, but none of the judges ever made a ruling if indeed a formal motion had been made.

In short, "the difficult task of balancing all the relevant factors relating to the respective interests of the State and the defendant[]," and applying the court's "subjective reactions to the particular circumstances [to] arrive[] at a just conclusion" is, in the first instance, best delegated to the trial judge.  Merlino, 153 N.J. Super. at 17.  We therefore remand the matter to the Law Division to consider whether the delay in this case violated defendant's right to a speedy trial.  We leave it to the sound discretion of the trial court regarding the conduct of those proceedings, including whether testimony is necessary.

Should the court conclude defendant's speedy trial rights were violated, it shall vacate defendant's judgment of conviction and dismiss the indictment.  Should the court conclude otherwise, our judgment affirms defendant's conviction.

Affirmed in part; remanded in part.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2145-16T3